152 P.3d 1209

**MARINA P., Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, Angel P., David R., Jr., and Glenda P., Appellees.**

**No. 1 CA–JV 05–0198.**

Court of Appeals of Arizona, Division 1, Department C.

Feb. 20, 2007.

As Corrected April 26, 2007.

Terry Goddard, Attorney General By Carol A. Salvati, Assistant Attorney General, Phoenix, Attorneys for Appellee ADES.

John A. Cicala, Yuma, Attorney for Appellant.

**OPINION**

SNOW, Judge.

¶ 1 Marina P. ("Mother") appeals the termination of her parental rights to her three children Glenda P., David R. Jr., and Angel P. Because, in light of the appropriate statutory requirements, the juvenile court's findings of fact do not support termination, we reverse.

**FACTUAL AND PROCEDURAL HISTORY**

¶ 2 Mother is not a legal resident of the United States. Mother's three children,

however, are United States citizens. On September 1, 2004, Mother and her three children were residing with Mother's sister Francisca and Francisca's child in Yuma, Arizona. Francisca, like Mother, is not a legal resident of the United States. In the early afternoon, Mother left her children with Francisca while she went to the store. While Mother was away, the United States Marshall Service came to the home and apprehended Francisca.

¶ 3 Francisca called Mother to tell her not to return home because border patrol agents were there. When Mother received the phone call from Francisca, she called her aunt, Rosa R., a legal resident of the United States, to go to Francisca's home and take charge of her children.[1] When the aunt arrived at the scene, CPS would not allow her to take Mother's three children because Mother was not present to give the authorization.

¶ 4 Later in the day the aunt came to the CPS office with Belinda M. ("grandmother"), the paternal grandmother of Mother's two oldest children, to claim Mother's children. Grandmother, who lives in San Luis, Arizona, is a legal resident of the United States. She had, on previous occasions, provided care to the children and was willing to take them. Instead of releasing the children to grandmother, CPS took the children into its temporary custody and then placed the children with grandmother.

¶ 5 The next day, Mother called CPS offices requesting her children. Mother's initial CPS case manager, Ralph Miranda, set up a meeting with Mother for the following day. Mother arrived at her appointment accompanied by her aunt, Rosa R. Mother informed Mr. Miranda that as yet she had no new permanent address but provided him with her cell-phone number. Rather than return the children to Mother, Mr. Miranda provided Mother with the notice required by Arizona Revised Statutes ("A.R.S.") section 8–823 (2003) informing her that CPS had

taken her children into its temporary custody. According to the notice, temporary custody was necessary because Mother was "on the run" from the border patrol. CPS declined Mother's alternate request to return the children to her aunt due to her aunt's prior criminal conviction.

¶ 6 Mother requested that she be allowed to visit her children placed with grandmother, but she requested that the visitation be away from grandmother's home because someone among her acquaintances was reporting her whereabouts to the border patrol and she believed that person could be grandmother. Such visitation was arranged.

¶ 7 Four days later, on September 7, 2004, the Arizona Department of Economic Services ("ADES"), CPS's parent agency, filed a dependency petition alleging that Mother's children were dependent as to her because she was "hiding from the border patrol." At the preliminary protective hearing on September 13, 2004, however, the State agreed with Mother that "[t]his matter is more of an immigration matter rather then [sic] a dependency matter." Accordingly, it agreed to return the children to Mother despite her residence status without requiring that she participate in reunification programs as a condition of that return. It merely required Mother to provide an address for the children, a plan for their care in the case of Mother's deportation, and a urinalysis. The court continued Mother's initial dependency hearing for a brief period to allow Mother to comply with these conditions.

¶ 8 Mother took a urinalysis test on that same date—September 13, 2004. It showed that Mother had used methamphetamine, but, before CPS could respond to Mother's positive test, border patrol contacted Mr. Miranda and asked him to disclose the date, time and place of Mother's next visitation. Mr. Miranda did so. This disclosure resulted in Mother being taken into custody by border patrol at her next scheduled visitation with her children. Mother was incarcerated

---

1. David is the biological father of the older two children, Glenda and David Jr. He is a legal resident of the United States, but, on the date when the children were taken into Child Protective Services ("CPS") custody he was incarcerated for domestic violence against Mother. Miguel is the father of the youngest child, Angel. Neither biological father appeals the termination of his parental rights.

for approximately six weeks and then was deported to Mexico. Mother was thus not present at the remainder of the Arizona hearings concerning whether her children were dependent.

¶ 9 After being discharged to Mexico, Mother resided in San Luis, Mexico, across the border from her children in San Luis, Arizona. Mother had no home or place to stay and moved among different accommodations. She and Francisca, who was also deported, initially stayed in a hotel and then lived in an unfinished building. When Mother's aunt subsequently visited Mother in Mexico, Mother had a bed with another family.

¶ 10 Sometime shortly after Mother was discharged to Mexico, Rosa Heras, Francisca's CPS caseworker, was also assigned as Mother's caseworker. Ms. Heras asked Francisca to let Mother know to call her. Ms. Heras tried to obtain from Francisca an address or a telephone number or a point of contact for Mother and Francisca. On occasion, when Francisca was talking with Ms. Heras, Mother would get on the phone and speak briefly with her. Mother did not keep in regular contact with Ms. Heras. Ms. Heras encouraged Mother to go to DIF, Mexican Social Services, to obtain a home study "to assist in determining what [Mother's] actual situation is in Mexico and whether placement of the children under her care were be (sic) feasible."

¶ 11 On November 22, 2004, at the dependency hearing scheduled in Arizona, the juvenile court found the children dependent as to Mother "for the reasons alleged in the de-

pendency petition" and ordered that the continued placement of the children with their paternal grandmother was in their best interests. It further found that the case plan of family reunification was appropriate.

¶ 12 Mother returned to the United States without authorization on or about June 9, 2005. She provided her address to Ms. Heras and thereafter began regular weekly visitation with her children coordinated by CPS.[2] Mother began attending a church and receiving counseling from the pastor, Virgil Huerta, twice a week. Several weeks after Mother's return and resumption of official visitation, and more than a month prior to the permanency planning hearing, the State filed a Motion for Termination of the Parent–Child Relationship. The sole statutory basis on which the termination motion was based was A.R.S. § 8–533(B)(8)(a) (Supp.2006)[3]—the children had been in court-supervised out-of-home care for nine months and Mother had "substantially neglected or willfully refused to remedy the circumstances" that had caused her children to be placed in court-supervised out-of-home care.

¶ 13 Near the time the motion for termination was filed, Ms. Heras made a referral so that Mother could begin random urinalysis testing.[4] Also, sometime thereafter, Ms. Heras arranged for Mother to begin to take parenting classes.[5]

¶ 14 On July 26, border patrol contacted Ms. Heras and requested that she disclose Mother's whereabouts. Ms. Heras initially declined to do so, but, after consultation, CPS informed the border patrol of Mother's address and schedule. The next day Mother

2. Angel, who was determined not to be grandmother's grandchild, was removed from her care at her request and placed with another foster family on June 10, 2005.

3. The current version of the statute is essentially the same as that in effect at the relevant time.

4. The random urinalysis program required Mother to call into a testing service every weekday. On random days, Mother would be instructed to further report for urinalysis testing. Although the record does not make clear exactly when Ms. Heras set up random urinalysis services for Mother, Ms. Heras testified from her notes that, after service was initiated, Mother said she had

problems accessing the service line and called Ms. Heras on July 14 to report this. Ms. Heras assisted Mother in making her first call on July 20, which was also a date on which Mother was required to report for her first random urinalysis test. The test showed no use of methamphetamine by Mother.

5. Ms. Heras testified that she had initially provided parenting classes for Mother in July or August 2005. Mother testified that she thought such classes had begun in August and that she had gone to two classes a week since their initiation. In either case, Ms. Heras testified that Mother consistently attended the classes from the time they began until the severance trial.

was again arrested by the border patrol at CPS offices during a supervised visit with her children. She was again deported to Mexico.

¶ 15 On August 9, the juvenile court held the permanency planning hearing at which it approved the change of the case plan to severance and adoption. By August 12, Mother had returned to the United States and had again made contact with Ms. Heras. Ms. Heras resumed visitation, urinalysis services, and parenting classes for Mother. Mother complied with these services. Mother's church provided her with some financial assistance. With some money contributed by the church and some she supplied, Mother placed a deposit on a mobile home that she had arranged to rent prior to her severance trial to provide a permanent location for her children.

¶ 16 The juvenile court held the severance trial on November 2, 2005. It heard the testimony of Mother, Mother's CPS caseworkers, Mr. Miranda and Ms. Heras, grandmother, Mother's aunt, Mother's pastor and others. At the end of the trial, the juvenile court concluded that Mother has "substantially neglected and/or has willfully refused to remedy the conditions which cause [her] children to be in out-of-home care despite the agency's diligent efforts to provide appropriate remedial services." It thus terminated Mother's parental rights.

¶ 17 Mother timely appealed the severance order. We have jurisdiction pursuant to A.R.S. §§ 8–235 (Supp.2006) and 12–120.21 (2003), and Arizona Rule of Procedure for the Juvenile Court 88.

## ANALYSIS

 ¶ 18 To terminate parental rights pursuant to A.R.S. § 8–533(B)(8)(a), a juvenile court must find by clear and convincing evidence that a statutory ground for termination exists and that "the agency responsible for the care of the child has made a diligent effort to provide appropriate reunification services." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8, 83 P.3d 43, 47 (App.2004). The court must also find by a preponderance of the evidence that termi-

nation is in the child's best interests. A.R.S. § 8–533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 282–84, 110 P.3d 1013, 1016–18 (2005). Because, in light of statutory requirements, the juvenile court's finding that Mother had "substantially neglected or willfully refused to remedy the circumstances" that had caused her children to be in court-supervised out-of-home care was not supported by substantial evidence, we reverse the court's order terminating Mother's parental rights.

### A. The Statutory Ground For Severance.

¶ 19 Section 8–533(B) sets forth a number of separate reasons a parent's right to her children may be terminated. Although ADES may allege as many statutory grounds as are applicable in a single termination case, it alleged only one here—that Mother "substantially neglected or willfully refused to remedy the circumstances which cause the child to be in an out-of-home placement" supervised by the juvenile court. A.R.S. § 8–533(B)(8)(a).

¶ 20 In terminations resulting from the amount of time that a child has been in court-supervised care outside of the child's home, section 8–533(B)(8)(a) provides the shortest period—nine months—in which termination may occur. To achieve this expedited termination, the moving party must establish that the parent has "substantially neglected or willfully refused" to cure the circumstances that had caused the child to remain in a court-supervised placement out of the parent's care. Thus, the test focuses on the level of the parent's effort to cure the circumstances rather than the parent's success in actually doing so.

¶ 21 If the moving party cannot establish that the parent "substantially neglected or willfully refused" to cure the circumstances, even if it establishes that the circumstances were not cured at the time of severance, it cannot obtain severance until the child has been in an out-of-home placement for at least fifteen months. See A.R.S. § 8–533(B)(8)(b) (providing for severance after the child has been in out-of-home care for fifteen months when the parent is unable to cure the circumstances that cause out-of-home placement and when "there is a substantial likelihood

that the parent will not be capable of exercising proper and effective parental care and control in the near future").

¶ 22 In making a determination that a parent has "substantially neglected or willfully refused to remedy the circumstances which cause the child to be in an out-of-home placement" as section 8–533(B)(8)(a) requires, we construe those circumstances, as we have in similar contexts, "to mean those circumstances existing at the time of the severance" that prevent a parent from being able to appropriately provide for his or her children. *See, e.g., Maricopa County Juv. Action No. JS–8441,* 175 Ariz. 463, 468, 857 P.2d 1317, 1322 (App.1993), *abrogated on other grounds by Kent K.,* 210 Ariz. at 282–84, 110 P.3d at 1016–18.

¶ 23 In its Findings of Fact, Conclusions of Law and Order ("Order"), the juvenile court made a number of factual findings, none of which directly identified the circumstance, that, at severance, had caused the court-supervised out-of-home placement of Mother's children and that Mother had substantially neglected or willfully refused to remedy. It determined:

> The Court is satisfied the conditions have not been remedied. In fact, the conditions are not being remedied at this point. There is no indication things have changed. There has been little or no contact with the children. There is no evidence the conditions are going to change in any substantial way in the near future. The mother abandoned the children when they were picked up and left for Mexico. It was abandonment. That is not a ground for severance in this case but she elected on her own to leave this country and leave them with family members or with CPS because they were eventually taken into custody. She has made no effort in the last nine months. Concerning DIF, the Court does not think they work [sic] any different [sic] than CPS. Contact is made. There has to be some stability or ability to provide services. It's no different in the United States than in Mexico. In this case, the mother did not afford herself of that. She had no home and she could not support her children. There were no ser-

vices that were going to be provided to her just like here unless she made contact for those services. She did not.

¶ 24 Among these various findings, the only one that seemingly pertains to a condition existing at severance that prevented Mother from parenting her children is that "[t]here has been little or no contact with the children." The balance of the juvenile court's findings relates either to the initial reason for the out-of-home placement or to the adequacy of Mother's efforts to remedy those circumstances and achieve the return of her children. Because the court elsewhere in its Order determined that Mother "substantially neglected or willfully refused to remedy the circumstances" that led to her children's out-of-home placement, we must presume that the circumstance that Mother "substantially neglected or willfully refused to remedy" is that "there has been little or no contact with the children."

¶ 25 In reviewing the evidence in the record to support this finding, however, we find no basis for it. To the extent findings are not adequately supported by the record, they are clearly erroneous. *Grant v. Ariz. Pub. Serv. Co.,* 133 Ariz. 434, 456, 652 P.2d 507, 529 (1982).

**B. Mother Did Not Fail To Maintain Contact With Her Children.**

¶ 26 The uncontested evidence in the record is that, after it took custody of the children in September 2004, CPS set four visitations for Mother prior to her September 2004 incarceration and subsequent deportation. Mother was late but did visit her children on the first and third scheduled occasions. She missed the second. On the fourth scheduled visit, Mother arrived and was taken into custody by the border patrol and was subsequently incarcerated for six weeks and then discharged to Mexico.

¶ 27 After Mother was discharged to Mexico, grandmother, on more than one occasion, brought the children to visit Mother. Grandmother did so without the authorization of CPS, with the last known visit set forth in the record being January 2005. CPS thereafter discovered the visits and instructed

grandmother to stop making them. There is no evidence in the record that she did so, or that she prevented Mother from making telephone or other contacts with the children while Mother was in Mexico.

¶ 28 When Mother returned to the United States on approximately June 9, 2005, grandmother allowed Mother to have phone contact with the children, and then, three days later, Mother contacted Ms. Heras to set a regular weekly visitation schedule. Mother has consistently kept that visitation schedule. Although official visitation did not occur for approximately two weeks in late July and early August when Mother was again deported, visitation was re-established after Mother's return, and Mother consistently complied with her scheduled visitation.[6] Mother, therefore, was in regular contact with her children for at least the five months preceding severance. In addition to Mother's compliance with all visitation services offered her by ADES, the caseworker was also aware of other contact between Mother and the children in this case, even though she offered no testimony as to its extent.

¶ 29 The State argues that, because prior to her initial deportation Mother was late for two and missed one of her scheduled visits with the children, there is a basis upon which we should affirm the juvenile court's termination because Mother failed to comply with reunification services. We reject this argument because it does not address whether a basis for severance existed. As we have previously stated, the question is whether there were circumstances at the time of severance that prevented Mother from parenting the children that Mother has substantially neglected or willfully refused to remedy.

¶ 30 Missing one visit and being late for two others fourteen months prior to the sev-

erance trial hardly qualifies as an existing circumstance at the time of severance. This is especially true when evaluated, as it must be, in the context of Mother's consistent visitation of her children that occurred once ADES made such programs available to Mother. Under A.R.S. § 8–533(B)(8)(a), "parents who make appreciable, good faith efforts to comply with remedial programs outlined by ADES will not be found to have substantially neglected to remedy the circumstances that caused the out-of-home placement, even if they cannot completely overcome their difficulties." *Maricopa County Juv. Action No. JS–501568*, 177 Ariz. 571, 576, 869 P.2d 1224, 1229 (App.1994).

¶ 31 Mother maintained contact with her children to the extent that CPS permitted her to maintain it. She continuously kept her permitted visitation in the five months prior to severance. While she was out of the country, Mother engaged in visitation of her children beyond that which was authorized by CPS. CPS offered no evidence that Mother did not have contact with the children, through telephone or otherwise, while she was in Mexico. In light of these facts, the juvenile court abused its discretion in determining that Mother "substantially neglected or willfully refused to remedy" the lack of contact she had with her children and that this lack of contact was an unresolved circumstance existing at the time of severance that justified severance.

¶ 32 The juvenile court also found that when her children were picked up by the border patrol, Mother abandoned her children and "elected on her own to leave this country." There is no evidence in the record that supports this finding. In fact, all of the evidence is to the contrary.[7] It thus cannot

---

**6.** On both occasions that Mother was deported, Mother's deportation resulted from the fact that she kept her visitation with her children and CPS revealed her scheduled visitation dates to the border patrol.

**7.** The juvenile court also found that Mother had failed while she was in Mexico to seek services from DIF, Mexican Social Services. Mother testified that she had sought such services, but they were not provided because she did not have a stable residence. Even assuming there is a basis in the record to support the court's determina-

tion that Mother did not seek such services, there is no testimony in the record that DIF would have been able or willing to provide Mother with services necessary to meet the agency's requirement under A.R.S. § 8–533(B)(8)(a) that "appropriate reunification services" be provided to the family prior to termination. In her testimony, which was the only evidence discussing DIF, Ms. Heras acknowledged that in her history as a caseworker in Yuma County she had never been involved with a case in which DIF had provided any services:

support a finding by the juvenile court that Mother abandoned or "substantially neglected or willfully refused" to maintain contact with her children.

## C. The Juvenile Court Identified No Other Circumstances Existing At Severance That Require Mother's Children To Be In Out–of–Home Placement.

### 1. Allegations of Drug Use

¶ 33 At the hearing Ms. Heras expressed her opinion that the real reason Mother's rights should be terminated is because Mother had a drug problem. She based this opinion on unspecified information she received from Mother's sister, Francisca, prior to November 2004 when Ms. Heras also became Mother's caseworker. Ms. Heras also based this opinion on her belief that the man with whom Mother was living in July 2005 at the time of her second deportation was arrested for drug possession.[8]

¶ 34 Although the State presented this attenuated evidence of a drug problem at the hearing, together with evidence of Mother's positive urinalysis test in September 2004 and Mother's apparent admission that she had used drugs in the past, the juvenile court made no findings as to Mother's drug use in its Order. For the following reasons, we decline to imply that the juvenile court made such a finding.

¶ 35 In its motion for termination, ADES did not allege the available statutory basis that Mother's parental rights should be severed because she "is unable to discharge [her] parental responsibilities because of . . . a history of chronic abuse of dangerous drugs." A.R.S. § 8–533(B)(3). Nor did it otherwise inform Mother that it was seeking to terminate her parental rights pursuant to A.R.S. § 8–533(B)(8)(a) because she was "substantially neglect[ing] or willfully refus[ing]" to cure a drug dependency that made her unable to parent. In the absence of allegations of drug use in the temporary custody notice, the dependency petition or the motion for termination, Mother received no advance notice that the State would allege chronic drug use as a basis for severance. To "substantially [neglect] or willfully [refuse] to remedy a circumstance," a parent must be aware that ADES alleges that the circumstance exists and is one that, if it continues to exist at severance, may result in the termination of her parental rights. *See, e.g., Maricopa County Juv. Action No. JS–8441*, 175 Ariz. at 468, 857 P.2d at 1322 (rejecting father's argument that he was not given notice of the circumstances upon which his severance was based not because notice was unnecessary but because "father was advised at every stage of the child's development about what he needed to do to regain custody"). There is no evidence in the record that Mother was provided with that notice.

¶ 36 Further, Mother substantially participated in the random urinalysis program once it was offered by CPS except for the month-long hiatus explained by Mother's second deportation. All of the tests introduced at trial from Mother's random tests in July, September and October 2005 indicated that she had not used any illegal substances. In light of Mother's substantial participation in the parenting classes and random urinalysis programs once they were offered by CPS, there would be a substantial question whether Mother had "substantially neglected or willfully refused" to remedy any drug prob-

---

Q. I've heard some talk about DIF numerous times in numerous cases, but I don't recall ever a case that I've heard any testimony that DIF actually did anything. Can you quote me one?

A. No. Based on my case load, no, I cannot.

Q. So the DIF referral is essentially meaningless?

A. Well, I think if the person that is needing the service makes contact with that agency they can—

Q. Don't they want money?

A. I'm not sure how they work.

Q. Haven't we heard testimony in other cases that people couldn't do things because they don't have money to pay them?

A. I'm not sure.

Q. But you have never had any luck with DIF?

A. Not with a particular case.

Q. With any case?

A. No, I really have not.

8. Mother's counsel stated that he believed he represented the man with whom Mother had been living in July 2005 on the relevant charges and they were not drug-related.

lem she might have had, thus authorizing the termination of her parental rights in a nine-month rather than a fifteen-month period pursuant to section 8–533(B)(8)(a).

¶ 37 Further, prior to terminating parental rights pursuant to A.R.S. § 8–533(B)(8)(a) the agency responsible for the care of the children is under a statutory and a constitutional obligation to make reasonable efforts to reunify the family. *See, e.g.*, A.R.S. § 8–533(B)(8) (State must make "a diligent effort to provide appropriate reunification services" prior to severance); *see also Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 32, 971 P.2d 1046, 1053 (App.1999) (holding that the State has a duty on constitutional grounds to make reasonable efforts to preserve the family). The State makes no argument that this statutory requirement does not apply here. If CPS believed that Mother's ability to parent was impaired by her drug use, there would be a substantial question whether CPS would be required to establish that Mother had the opportunity to participate in substance-abuse treatment programs prior to terminating parental rights pursuant to A.R.S. § 8–533(b)(8)(a).

¶ 38 We thus decline to interpret the juvenile court's order referring to "unremedied conditions" that the court did not identify as including Mother's chronic drug use. We thus do not affirm the severance on that basis.

### 2. Mother's Illegal Status

¶ 39 The State also presented some evidence and argument at the termination hearing pertaining to Mother's illegal status in this country. In its closing argument, however, the State itself characterized Mother's illegal status in this country as a "minor point." In its Order, the juvenile court made it explicit that Mother's illegal status was not the reason it terminated her parental rights. "This is not a severance based on the illegal status of the [M]other in this country, although that is a fact in this case."

¶ 40 As the juvenile court suggested, a parent's illegal status in this country is not,

in and of itself, a statutorily enumerated basis for terminating Mother's parental rights. As the juvenile court further suggested, however, a parent's illegal status may cause or contribute to the existence of such a basis. Nevertheless, in light of the juvenile court's determination that this "severance is not based on the illegal status of the [M]other in this country," and its failure to identify any other circumstance related to Mother's illegal status that had caused her children to have been placed in court-supervised care outside of Mother's home at the time of severance, we need not assume that facts related to Mother's illegal status were determined by the juvenile court to be such a circumstance.

¶ 41 The juvenile court, in evaluating the trial testimony concluded that, while she was in Mexico, Mother "had no home and could not support her children." Evidence in the record supports that finding. But the fact that Mother was not successful in acquiring a home or employment while in Mexico that would allow her to support her children does not amount to a finding that she "substantially neglected or willfully refused" to do so as A.R.S. § 8–533(B)(8)(a) requires. There is no such finding in the record.

¶ 42 Further, at the time of severance, Mother, Mr. Huerta, and Ms. Heras all testified that Mother had arranged a home for her children with the assistance of her church community in Yuma County. And, even prior to the filing of the dependency petition, Mother had requested that CPS return her children to her aunt, a legal resident of the United States, whose continued care for the children in this country would not necessarily have required a placement of the children under court-supervised care. CPS declined to do so based on the aunt's past criminal conviction. Nevertheless, the juvenile court never apparently considered whether CPS had authority to decline to return the children at Mother's request to the aunt when ADES agreed at the initial dependency hearing that "the matter is more of an immigration rather then [sic] a dependency matter." [9] Nor did the court subse-

---

9. In circumstances like this, before CPS may take a child into temporary custody, probable

cause must exist to believe that the child either is "or will imminently become a victim of abuse or

quently consider whether the return of the children to Mother's aunt would be a preferable alternative to the termination of Mother's parental rights.[10]

¶ 43 In this context we need not determine whether, ultimately, such efforts by Mother would have been sufficient to prevent the need for the court-supervised out-of-home placement of her children. We need only observe that, given such efforts, Mother did not substantially neglect or willfully refuse "to remedy the circumstances" that had caused her children to be placed outside her care in a court-supervised setting.

¶ 44 To terminate parental rights pursuant to A.R.S. § 8–533(B)(8)(a), the moving party must establish that the circumstances that caused Mother's children to be placed out of her home had been previously identified to her, that the circumstances continued to exist at the time of severance and that Mother had "substantially neglected or willfully refused" to remedy those circumstances despite appropriate services being provided by the agency responsible for the care of the child. Here, the only circumstance found by the juvenile court is not supported by the evidence. No other such circumstance was identified to Mother or ascertainable in or supported by the record. We thus conclude that in this case the requirements of severance have not been met.

## CONCLUSION

¶ 45 We acknowledge those including grandmother who currently care for the children and desire to adopt them, and commend

them for their service to the children. We recognize the frustration to them that accompanies this reversal of Mother's termination. Nevertheless, any termination of Mother's parental rights cannot be affirmed unless it is in accord with the statutory mandates. Because Mother's termination was not, we reverse the juvenile court's termination Order and remand for further proceedings consistent with this opinion.

CONCURRING: PATRICIA K. NORRIS, Presiding Judge, and MAURICE PORTLEY, Judge.

neglect." A.R.S. § 8–821(B)(1). That Mother is attempting to evade detection and deportation does not, in and of itself, create probable cause to believe her children are in imminent danger of abuse or neglect. Again, while her illegal status may create or contribute to such circumstances, in the absence of facts demonstrating that it does, it is not a sufficient basis on which CPS can take temporary custody. Here the only reason CPS listed in the statutorily-required notice justifying taking Mother's children into temporary custody was that Mother's sister "was arrested by U.S. Marshall and Mother, Marina P[ ]. Is on the run per U.S. Marshall." Not only did Mother's aunt, at Mother's bidding, and the children's paternal grandmother seek to obtain care of the children at the time that Francisca was apprehended, the next day Mother personally

requested from the CPS caseworker the return of her children or their return to her aunt. CPS declined to comply with either request. But, in the absence of facts demonstrating probable cause that the children were in imminent danger of abuse or neglect, there is a substantial question whether CPS had a basis for doing so.

10. After CPS's placement of the children with their paternal grandmother, nothing in the record suggests it considered whether Mother was allowed to attempt to arrange for her children to remain with their grandmother or other family members in the United States, under a permanent guardianship or otherwise, without losing her parental rights.