NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

THOMAS H., ECHO T., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY,[1] D.E., A.H., *Appellees.*

No. 1 CA-JV 14-0042
FILED 08-28-2014

Appeal from the Superior Court in Maricopa County
No.  JD21302
The Honorable Joan M. Sinclair, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant Thomas H.*

The Stavris Law Firm, PLLC, Scottsdale
By Christopher Stavris
*Counsel for Appellant Echo T.*

---

[1]      Pursuant to S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted), the Department of Child Safety ("DCS") is substituted for the Arizona Department of Economic Security ("ADES") in this matter. *See* ARCAP 27.  For ease of reference, we refer to ADES in the text of this memorandum decision when referring to either ADES or DCS.

Arizona Attorney General's Office, Phoenix
By Michael Valenzuela
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge Kent E. Cattani delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge John C. Gemmill joined.

---

**C A T T A N I**, Judge:

**¶1**        This is an appeal from a juvenile court's order granting ADES's motion to terminate a father's parental rights to his daughter and a mother's parental rights to her son and daughter. For reasons that follow, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**        Thomas H. ("Father") is the biological father of A.H., born in July 2011. Echo T. ("Mother") is the biological mother of A.H. as well as D.E., born in February 2007.[2] In late December 2011, ADES received a report that Father and Mother were homeless, destitute, and had left A.H. with her paternal aunt.[3] One day after being dropped off at the aunt's house, A.H. developed a high fever. When A.H. became ill and needed treatment, the aunt could not immediately reach Father and Mother. A.H. had to be hospitalized for pneumonia.

---

[2]        D.E.'s biological father is not a party to this appeal.

[3]        Father and Mother often asked family members for money and food, and they frequently left D.E. and A.H. with others because of an inability to meet the children's needs. In this matter, Mother placed the children temporarily with relatives when she was evicted from where she was living.

¶3 In early January 2012, ADES took D.E. and A.H. into temporary physical custody and placed them with A.H.'s paternal aunt.[4] Shortly thereafter, ADES filed a dependency action alleging neglect due to Father's and Mother's substance abuse, as well as their failure to provide the children with the basic necessities of life and to protect A.H. from abuse by other caregivers.[5] Father and Mother did not contest the dependency allegations, and the court found A.H. dependent as to Father and D.E. and A.H. dependent as to Mother. ADES established a case plan of family reunification concurrent with severance and adoption as to A.H., and of family reunification as to D.E.

¶4 After removal, D.E. reported instances of domestic violence and physical abuse. D.E. told an ADES case manager that Father intentionally burned him with cigarettes. D.E. also reported to a court-appointed psychologist, Dr. Glenn L. Moe, that Father and Mother often fought in the home, and Father would break walls during the fights. D.E. reported that Father and Mother would punish him by hitting him in the face. D.E. was afraid he would be hurt if he lived with Father and Mother. Dr. Moe diagnosed D.E. with post-traumatic stress disorder due to his history of neglect, exposure to domestic violence, and physical abuse.

¶5 After being brought under ADES's care, A.H. was diagnosed with various medical conditions, for which she receives on-going treatment and therapy: patent ductus arterious (small hole in the heart), an egg yolk allergy, dysphagia (difficulty swallowing), laryngeal penetration (foreign body in the larynx), feeding difficulties, and Chiari malformation (a genetic condition in which brain tissue protrudes into the spinal canal).

¶6 ADES offered Father and Mother reunification services, including: substance-abuse treatment, drug testing, psychological evaluations, counseling, psychiatric evaluations, parent-aide assistance, and supervised visitation.

---

[4] A.H. remained with her paternal aunt during the entire dependency; D.E. began living with his paternal grandparents in March 2012.

[5] After Mother arrived at the hospital, staff asked her about a burn mark on A.H.'s toe. Mother reported that "one of [A.H.'s] babysitters must have burned her with a cigarette." Mother also asked staff to examine A.H. for a possible yeast infection that she had noticed after picking up A.H. from a different babysitter.

¶7            In February 2012, Father and Mother were allowed parent-aide visits with D.E. and A.H., but Father and Mother were inconsistent in visiting their children over the next nine months.  ADES began receiving reports that D.E. was exhibiting negative emotional behavior as a result of the visits.  Dr. Moe evaluated D.E. in June 2012 and concluded it was in D.E's best interests to decrease his visits, so he would have time between visits to "stabilize in his emotional and behavioral functioning."

¶8            After an evidentiary hearing in September 2012, the juvenile court allowed ADES to decease D.E.'s visitation time.  That same month, Dr. John P. DiBacco conducted a best interests evaluation and opined that the children had developed an anxious attachment to Mother.  Dr. DiBacco concluded that Father's and Mother's instability and chaotic lifestyle had negatively impacted the children and that the children would be at risk in the parents' care until the parents addressed their substance abuse issues.

¶9            In November 2012, the parents' first parent-aide referral closed, and ADES referred the parents for another round of parent-aide services in January 2013.  Mother resumed visits in January 2013, but Father did not complete the intake process.  During the two months between parent-aide referrals, D.E.'s negative behaviors decreased.  When visits with Mother restarted, D.E. resumed negative behaviors, and he seemed insecure and angry.

¶10           In February 2013, the juvenile court suspended visits with D.E. because of D.E.'s continued negative reactions to the visits.  The court also ordered Mother to participate in therapeutic visits with A.H. to address A.H.'s anxious attachment to her.  Although ADES referred Mother for therapeutic visits, Mother's referral was closed due to non-participation.  Mother inconsistently participated in parent-aide visits with A.H., and Father failed to participate in referrals for case-aide visits in February and May 2013.

¶11           In April 2013, ADES moved to terminate Father's parental rights to A.H. and Mother's parental rights to D.E. and A.H. on grounds of substance abuse and 15 months' time in care.  After the change in case plan, Father's and Mother's participation in supervised visitation increased, with Father beginning to participate in case-aide visits in July 2013 and Mother attending parent-aide visits in June and July 2013.

¶12           Around the same time, ADES received reports that A.H. was having "significant emotional reactions" following her visits with Father

4

and Mother.[6] Dr. Moe opined that it was in A.H.'s best interests to cease all visitation with Father and Mother because "re-exposing her to the parents through visitation [was] traumatizing for her." Dr. Moe concluded that Father and Mother had not made use of the visitation services available to them because Mother missed two-thirds of her scheduled visitations with the children from January 2013 to June 2013, and because Father did not participate in visitation services with A.H. after September 2012, and had only occasional contact with her during medical/therapy appointments.

¶13　　　　In September 2013, after an evidentiary hearing, the juvenile court found that "continued visitation for either child with any parent at this point would be harmful to the children's emotional health" and ordered that visits between D.E. and Mother not be resumed and that visits between A.H. and Father and Mother no longer take place.

¶14　　　　In February 2014, after a five-day evidentiary hearing, the court terminated Father's and Mother's parental rights on both grounds and found severance to be in the best interests of the children. Father and Mother timely appealed, and we have jurisdiction under Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") § 8-235(A).[7]

## DISCUSSION

¶15　　　　Father and Mother argue that the evidence presented did not support severing their parental rights based on substance abuse and 15 months' time in care. Father also argues that the court erred by finding that severance of his parental rights was in A.H.'s best interests.

## I.　　Applicable Legal Standards.

¶16　　　　The juvenile court may terminate the parent–child relationship only if clear and convincing evidence establishes at least one statutory ground for severance. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22, 110 P.3d 1013, 1018 (2005); *see also* A.R.S. § 8-533(B). The court must also find by a preponderance of the evidence that severance is in the child's best interests. *Kent K.*, 210 Ariz. at 284, ¶ 22, 110 P.3d at 1018; *see also* A.R.S. § 8-533(B). We review the juvenile court's severance order for an abuse of

---

[6]　　For approximately three to five days after a visit with parents, A.H. would exhibit "extremely irritable behavior" and clinginess before returning to her "typically happy and cooperative demeanor."

[7]　　Absent material revisions after the relevant date, we cite a statute's current version.

discretion, viewing the evidence in the light most favorable to sustaining the court's findings and accepting the court's factual findings unless clearly erroneous. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8, 83 P.3d 43, 47 (App. 2004); *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2, 181 P.3d 1126, 1128 (App. 2008). We similarly defer to the juvenile court's credibility assessments. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4, 53 P.3d 203, 205 (App. 2002).

**¶17** The 15 months' time-in-care ground allows severance based on an out-of-home placement of 15 months or longer if "the parent has been unable to remedy the circumstances" necessitating the out-of-home placement and "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). The relevant circumstances are those existing at the time of severance. *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22, 152 P.3d 1209, 1213 (App. 2007).

**¶18** Here, at the time of the severance trial, the children had undisputedly been in an out-of-home placement for over two years. The juvenile court found that the circumstances causing the children's out-of-home placement included "the parents' instability, substance abuse and neglect."

**II. Reasonable Evidence Supports the Juvenile Court's Findings Regarding Statutory Grounds for Severing Father's Parental Rights to A.H.**

**¶19** Father began smoking marijuana when he was 16 years old and has smoked marijuana off and on since then. Father admitted regularly using marijuana in the evenings, claiming that it was for the treatment of back pain. Father asserted that he held a medical marijuana card from March 2012 to March 2013 for the treatment of back pain, but he did not provide a copy of his card to ADES, despite requests that he do so. Father has a prior conviction for a drug-related offense.

**¶20** Father completed substance abuse education classes at TERROS treatment center and was scheduled for random drug tests at the Treatment Assessment Screening Center ("TASC"). From January 2012 through October 2013, he missed 73 percent of almost 195 random drug tests, and he last submitted to drug testing in December 2012. All of his test results were positive for marijuana. Father admitted that he did not have an excuse for not complying with random drug testing in 2013. Because he

did not comply with random drug testing, he acknowledged that ADES had no way to determine whether he was using illegal substances.

¶21          Father testified that he last used marijuana in approximately December 2013, but admitted that he had no proof that he stopped using it. He indicated that he planned to obtain a medical marijuana card when he had the $300 required to do so. He indicated no plan to participate in a substance abuse treatment program because he did not feel it would be beneficial.

¶22          Father completed a psychological evaluation with Dr. Daniel Juliano, in which Dr. Juliano noted Father's and Mother's history of neglect and domestic violence, and he noted issues with substance abuse and alcohol use, an extensive history of ADES involvement, and instability from struggles with homelessness and unemployment. Dr. Juliano opined that neither parent had mental health issues that would prevent them from being successful in completing reunification efforts, but he recommended that Father participate in individual counseling for stress and anger management. Dr. Juliano noted that Father reported a "more active substance abuse history" than Mother, because Father acknowledged experimenting in the past with methamphetamine, alcohol, cocaine, and LSD.

¶23          ADES referred Father to Desert Edge Mentoring Services for individual counseling in August 2012 and in June 2013, but services ended because of his inconsistent attendance.[8]

¶24          ADES referred Father numerous times for a psychiatric evaluation with Dr. Richard Rosengard, but Father did not attend his scheduled appointments. Father denied having an anger-control problem, but admitted that he might have had a problem with his temper at one point in his life.

¶25          Although Father participated in the parent-aide program, he did not complete the program. Father testified that he completed parenting classes with Mother at the Family Resource Center, but he did not provide the court with a copy of required certificates of completion.

¶26          Father was inconsistent with visitation, which led Dr. Moe to opine that Father was not willing to follow through with consistent contact

---

[8]     Father originally testified that he attended six sessions at Desert Edge, but he later acknowledged that he did not dispute documentation showing that he only attended one session.

with A.H., a factor that Dr. Moe found critical to forming a secure relationship with her.

¶27 Father has lived in multiple locations while the children were in out-of-home placements. Father resided at his mother's house for a short period when the case first opened. Then, Father lived with Mother in an apartment for six months, with his grandmother for three months, and in his own one-bedroom apartment at the time of trial. Although Father claimed he had lived at the residence for eight months, he did not provide a copy of his lease or any other verification of his housing arrangement.

¶28 Father claimed to have had multiple employers since the children were taken into ADES's care. He was a painter for a few months, a construction worker for four months, and a painter for an additional four months. At the time of the severance trial, Father claimed that he was working full time as a union painter. Father testified that his take home pay was $500 per week, but he did not provide ADES with any documentation supporting his employment history or wages, other than one check.

¶29 The evidence presented supports the juvenile court's determination that Father's sporadic efforts to participate in substance abuse testing, individual counseling, and parent-aide and visitation services did not demonstrate a good faith effort to comply with reunification services. Although ADES asked Father to provide a copy of the medical marijuana card he claimed to have obtained, he never did so. And Father missed most of his required random drug tests and last submitted to testing in December 2012. When he did participate in drug screening, he tested positive for marijuana every time. Father's referral for individual counseling for stress and anger management was closed out due to his inconsistent attendance. Father did not complete the parent-aide program and only visited A.H. sporadically before the court stopped the visits due to A.H.'s negative reactions.

¶30 Father's refusal to participate in a psychiatric evaluation or to provide ADES with proof of stable housing and steady employment further demonstrated his unwillingness to remedy the circumstances that led to A.H.'s out-of-home placement. Accordingly, the evidence is sufficient and the juvenile court did not abuse its discretion by severing Father's parental rights to A.H. based on the ground of 15 months' time in care under A.R.S. § 8-533(B)(8)(c).

### III. Reasonable Evidence Supports the Juvenile Court's Findings Regarding Statutory Grounds for Severing Mother's Parental Rights to D.E. and A.H.

¶31 Mother began smoking marijuana when she was 15 years old. Mother admitted to using marijuana approximately every other day throughout the severance trial. Mother had a medical marijuana card from January 9, 2012 to January 9, 2013 and from May 24, 2013 through May 25, 2014. Mother claimed she used medical marijuana for treatment of shoulder pain, knee pain, and anxiety.

¶32 ADES referred Mother for substance abuse treatment at TERROS three times, but each time no recommendations for treatment were made. Although Mother first testified that she took hair follicle tests every three months, she later stated that she had submitted to a total of three hair follicle tests: in August 2012 (negative result), November 2012 (positive for marijuana metabolite), and November 2013 (positive for marijuana metabolite).

¶33 Mother was scheduled for random drug screens at TASC. Although Mother initially testified that she called and/or participated in every random drug test in the two months preceding trial, she later admitted missing required tests even after the severance trial began. From January 2012 through early January 2014, she missed over 70 percent of almost 250 random urinalysis tests. Of the tests she submitted to, all but four showed marijuana use. During the period of time when she did not have a medical marijuana card, she missed 55 of 58 random tests. The three tests she submitted to were positive for marijuana.

¶34 Mother participated in a psychological evaluation by Dr. Juliano, who opined that Mother has emotional difficulties due to a history of domestic violence with Father and D.E.'s biological father. Dr. Juliano recommended she participate in relationship therapy and a psychiatric assessment.

¶35 ADES referred Mother for counseling at Desert Edge Recovery twice to work on domestic violence and substance abuse issues. Despite D.E.'s account of domestic violence and abuse, Mother consistently denied that abuse or neglect occurred. Mother missed appointments during her first referral and did not successfully participate in her second referral. However, Mother did complete six parenting classes at the Family Resource Center.

¶36        In August 2012, psychiatrist Richard Rosengard evaluated Mother.  Although Dr. Rosengard opined that Mother did not have a mental condition that would prevent her from effective parenting, he expressed concern over her continued use of marijuana to control anxiety, and he recommended certain prescribed medications, but Mother refused to follow his recommendation.  Dr. Rosengard opined that a person with a medical marijuana card can still abuse marijuana and stated his concern that when a parent with a medical marijuana card does not submit to random drug testing, it is impossible to monitor whether the parent is using the drug at therapeutic levels.

¶37        In Spring 2013, ADES referred Mother to participate in family therapy to address bonding and attachment concerns with A.H., but the referral was closed because Mother did not submit to the provider the dates she would be available for therapy.

¶38        Mother's parent-aide services were closed in September 2013 with the following concerns: (1) Mother was in denial of her substance abuse problem and how it related to the abuse and neglect that brought this case to ADES's attention; (2) Mother was not addressing her substance abuse problem and had stated she was entitled to use marijuana; (3) Mother was not willing to participate in random drug tests; (4) Mother would not admit that D.E. and A.H. were exposed to domestic violence, and she did not understand its effect on the children; and (5) Mother did not see that her parenting negatively affected D.E.'s and A.H.'s emotional development.

¶39        While this matter remained pending, Mother was evicted multiple times and lived in seven different places.  Dr. DiBacco opined that because of Mother's instability, the children would be at risk if they were returned to her care.  Dr. Moe noted in particular that D.E. needed caregivers who would provide him with "consistency, stability, and nurturance."

¶40        Prior to this case, Mother had worked as an exotic dancer for ten years.  After the children were removed from her care, Mother completed massage therapy school.  At the time of the severance trial, Mother was cleaning houses, looking for a part-time massage therapy job, and attempting to start her own massage therapy business.  For the first week in January 2014, Mother testified that she made $205 cleaning houses.

¶41        In mid-January 2014, one week before the last day of the severance trial, Mother began participating in substance abuse counseling

at Lifewell Behavioral Wellness, and she testified that she was taking parenting classes at the Family Resource Center.

¶42 Throughout this matter, Mother denied having a substance abuse problem or that her marijuana use negatively affected her children. However, service providers expressed doubts regarding Mother's ability to safely parent D.E. and A.H., and in September 2012, Dr. DiBacco opined that D.E. and A.H. would be placed at risk if returned to Mother because of her instability, marijuana use, and chaotic lifestyle. In November 2013, Mother's parent aide noted that parent-aide services had been closed with concerns because Mother did not recognize the risk that her marijuana use posed to D.E. and A.H. Dr. Rosengard testified that Mother showed little or no insight into her marijuana use and could not "parent at this time without putting a child in jeopardy." Although Dr. Juliano opined that Mother was capable of parenting, he noted that she needed to comply with what ADES had requested of her to be reunited with her children.

¶43 The evidence presented supports the juvenile court's conclusion that Mother's sporadic efforts to participate in substance abuse testing, individual counseling, parent-aide services, family therapy, and visitation did not demonstrate a good faith effort to comply with reunification services. She tested positive for marijuana when she did not have a medical marijuana card, and her non-compliance with drug testing requirements precluded ADES from determining whether she was using marijuana at therapeutic levels even when she was authorized to use it. Mother did not complete her individual counseling for domestic violence and substance abuse issues. Parent-aide services were closed without successful completion and Mother refused to participate in family therapy/therapeutic visits to address A.H.'s anxiety issues. And, at the time of the severance hearing, she had not demonstrated an ability to provide a stable living arrangement for the children. Because ample evidence supported the juvenile court's finding that severance was warranted based on the ground of 15 months' time in care, the court did not abuse its discretion by severing Mother's parental rights.

¶44 Having found that the juvenile court properly based severance of Father's and Mother's parental rights on 15 months' time in care without remediation, we need not address the other severance ground of substance abuse. *See Jesus M.*, 203 Ariz. at 280, ¶ 3, 53 P.3d at 205.

## IV. Reasonable Evidence Supports the Juvenile Court's Finding that Severance Is in A.H.'s Best Interests.

¶45        Father argues that the juvenile court's best interests finding was not supported by the evidence because "the evidence established that Father was able to provide A.H. with permanency and stability" and ADES did not establish that A.H. was better off with adoptive parents than being raised by Father. We conclude otherwise.

¶46        To determine whether severance is in the best interests of a child, the court balances the parent's rights against the child's rights. *Kent K.*, 210 Ariz. at 287, ¶ 37, 110 P.3d at 1021. Termination of the parent–child relationship is in the child's best interests if the child would be harmed if the relationship continues or would benefit from termination. *Mary Lou C.*, 207 Ariz. at 50, ¶ 19, 83 P.3d at 50. Factors to consider include (1) whether an adoptive placement is immediately available, (2) whether the current placement is meeting the child's needs, and (3) whether the child is adoptable. *See Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5, 982 P.2d 1290, 1291 (App. 1998); *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352, 884 P.2d 234, 238 (App. 1994).

¶47        The juvenile court made the following best interests finding:

> The Court does not question the parents' love for their children. However, the children have been in care for two years and deserve permanency and stability. The Court is aware that Mother is attending substance abuse treatment now at Lifewell and that both parents have taken parenting classes. Unfortunately, this is too little, too late. The children are with family members who are willing to provide them with permanency and stability. Despite the children's needs, the children are adoptable. Severance of the parents' rights is in their best interests.

¶48        The evidence supports this finding. Father has not maintained stable housing or employment, and he refused to provide ADES with his current address. Father provided ADES with only one company paycheck, but no paycheck stubs or documentation regarding his employment or wages. The ADES case manager testified that severance of Father's parental rights is in A.H.'s best interests because she needs permanency and the security of knowing that she will be fed, will have a roof over her head, "and [will] not be exposed to chaotic lifestyles and environments." The case manager testified that A.H. had been put in

unsafe circumstances and exposed to unsafe people, and that her medical concerns and behaviors required constant parental supervision. A.H.'s placement with her paternal aunt had provided A.H. with a stable, protective, and safe environment. The placement met all of A.H.'s medical, dental, vision, social, and educational needs, and A.H.'s aunt was willing to adopt her. Thus, because severance of Father's parental rights would allow A.H. to be adopted into a permanent and stable home where her needs are met, the juvenile court did not did not abuse its discretion by finding severance to be in A.H.'s best interests.

## CONCLUSION

¶49        For the foregoing reasons, we affirm the juvenile court's termination of Father's parental rights to A.H. and Mother's parental rights to D.E. and A.H.



Ruth A. Willingham · Clerk of the Court
FILED: gsh