NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MICHELLE H., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.S., */Appellees*.

No. 1 CA-JV 15-0417
FILED 6-16-2016

Appeal from the Superior Court in Maricopa County
No. JD511179
The Honorable Karen L. O'Connor, Judge

**AFFIRMED**

COUNSEL

The Stavris Law Office, PLLC, Scottsdale
By Christopher Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Daniel R. Huff
*Counsel for Appellee Department of Child Safety*

_____

**MEMORANDUM DECISION**

Chief Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Maurice Portley joined.

_____

**B R O W N**, Chief Judge:

¶1          Michelle H. ("Mother") appeals the juvenile court's order terminating her parental rights to her daughter, J.S., challenging the sufficiency of the evidence.  Because reasonable evidence supports the court's order, we affirm.

## BACKGROUND

¶2          Mother and Davion S. ("Father") are the biological parents of the child, who was born in 2013.  Father's parental rights have also been terminated; however, he is not a party to this appeal.

¶3          In April 2013, the Department of Child Safety ("DCS") received a report that the child (three months old at the time) and her two-year-old cousin M.H, were living with Mother and Father and the child's maternal grandparents, in a "filthy" motel room where family members abused drugs and engaged in domestic violence.  As part of its subsequent investigation, DCS required Mother and the grandparents to submit to urinalysis testing.  After the grandparents tested positive for methamphetamine, DCS informed Mother that she needed to find a different place to live with the child (apart from the maternal grandparents), but Mother did not do so.

¶4          In June 2013, the child sustained a skull fracture, requiring emergency treatment, that neither parent could explain.  DCS took temporary custody of the child, but several days later returned the child to Mother under a safety plan that required Mother to secure safe housing that DCS later extended.  Mother, however, failed to move away from the harmful environment, contending that she did not believe her parents were using methamphetamine.

¶5          In July 2013, DCS took the child into care and informed Mother that to facilitate reunification she would be expected to (1) demonstrate an understanding of the harm that substance abusers cause and the impact they can have on the child, (2) show she could choose

appropriate caregivers and maintain a safe and substance-free home, and (3) financially care for herself and provide the child with basic necessities.

¶6        DCS filed a dependency petition, alleging that (1) Mother had neglected the child by failing to provide a safe and stable home environment and (2) Mother failed to protect her child and, as a result, the child suffered an unexplained skull fracture. In December 2013, the child was found dependent as to Mother; the court adopted a case plan of family reunification with a concurrent plan of severance and adoption, and the court ordered DCS to provide, and Mother to participate in, the following services: parent aide, parenting classes, a psychological consult and evaluation, and visitation.

¶7        In October 2013, Mother participated in a psychological evaluation with Dr. Jessica Leclerc, who concluded that although Mother was not suffering from mental illness or mental retardation, she would benefit from individual therapy to "address the development of coping skills, a more secure personality, and learn how lack of coping skills and an anxious/timid personality could negatively impact her relationship with her daughter and others." Dr. Leclerc also found that Mother would "need to develop insight into how her parents are contributing to an unsafe environment for [the child]" and "she displays very little insight into how her decisions have negatively impacted [the child]."

¶8        Mother's progress was limited. By July 2014, at the request of DCS, the court changed the case plan to severance and adoption over the parents' objection. DCS moved to terminate based on six and nine months' time-in-care under Arizona Revised Statutes ("A.R.S.") sections 8-533(B)(8)(a) & (b).

¶9        In March 2015, after Mother showed some progress as a result of services, the juvenile court granted DCS's request to withdraw the termination motion. Mother's progress, however, proved to be temporary, and in August 2015, DCS filed an amended termination motion, which added fifteen months' time-in-care as a third ground for severance. *See* A.R.S. § 8-533(B)(8)(c).

¶10        At the November 2015 termination adjudication, DCS case manager Victoria Palko testified that the child had been in an out-of-home placement for two years, and acknowledged that Mother participated in some of the services offered, including completion of a parenting course. Palko also noted that Mother's supervised visits with her child went well and she behaved appropriately. She commented that Mother was a "loving

parent to her daughter" during her visits. However, Palko explained that she continued to have the same concerns that existed when the child first came into DCS's custody:

> [Mother] had the benefit of having therapy for many months . . . and yet she still could not understand, [as was true] at the beginning of the case, why it was so detrimental to her child's [well-being] that she not live with a person that's abusing meth, such as her parents, and yet in July, there was another case, that's her sister's case, where the police department found [M.H.] to be residing in the care of [Mother] -- with the grandparents, in the home of [Mother], where [M.H.] was severely neglected to the point where she was in constant pain from tooth decay, . . . her tooth nerve being exposed. She had to go in for oral surgery to remedy that. In addition to that, [M.H.] has disclosed that she was a victim of sexual molestation while in the care of these . . . grandparents, and in the home of [Mother].

¶11        Palko also explained that Mother's employment the last two years had been sporadic and she missed many therapy appointments. Nor did Mother make the behavioral changes the therapist was seeking. Palko explained further that in June 2015, DCS learned that Mother's parents had moved in with her again, and she and her parents were unlawfully harboring M.H., a ward of the court. Palko testified that Mother's level of participation in services since June 2015 was "very disappointing."

¶12        The juvenile court granted the motion for termination on each of the three alleged grounds, noting Mother was "entwined in a dysfunctional family environment that includes drugs and violence." The court acknowledged that Mother had tested negative for substances, but had not demonstrated she can provide financially for her child, maintain safe and stable housing for her child, exhibit the parenting skills necessary to properly parent her child, or establish that she has an understanding of the risks maternal grandparents pose to her child. The court determined that (1) the child had been in an out-of-home placement for fifteen months or longer; (2) DCS had made diligent efforts to provide appropriate reunification services; (3) Mother had been unable to remedy the circumstances that caused the child to be in out-of-home placement; and (4) there was a substantial likelihood Mother would not be capable of proper and effective parental care and control in the near future. The juvenile court also determined that terminating the parent-child relationship would be in the child's interests. This timely appeal followed.

## DISCUSSION

**¶13** To grant a motion to terminate parental rights, the juvenile court must find at least one statutory ground is supported by clear and convincing evidence. *Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, 78, ¶ 6 (App. 2005). Additionally, the juvenile court must find by a preponderance of the evidence that the termination is in the best interests of the child.[1] *Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, 285, ¶ 11 (App. 2011); A.R.S. § 8-533(B). As the trier of fact, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of the witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). Accordingly, we will accept the juvenile court's findings of fact "unless no reasonable evidence supports those findings." *Jennifer B. v. Ariz. Dep't of Econ. Sec.*, 189 Ariz. 553, 555 (App. 1997).

**¶14** To prevail on its motion to terminate Mother's parental rights under A.R.S. § 8-533(B)(8)(c), DCS was required to show that the child has been in an out-of-home placement for a cumulative period of at least fifteen months and that Mother was "unable to remedy the circumstances that cause[d] the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental control in the near future." The "circumstances" causing the child's out-of-home placement are "those circumstances existing at the time of the severance" rather than at the time of the initial dependency petition. *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007). DCS is also required to prove it made a "diligent effort to provide appropriate reunification services" to justify termination of the parent-child relationship. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 177, ¶ 12 (App. 2014).

**¶15** Mother does not challenge the juvenile court's findings that the child has been in out-of-home placement for longer than fifteen months or that DCS made diligent reunification efforts. Rather, Mother argues that by finding employment, stable housing, maintaining negative urinalysis testing, completing a parenting class, demonstrating appropriate parenting during her parent aid sessions, and seeking additional referrals from her case manager for therapy sessions, DCS failed to provide sufficient

---

[1] Mother does not contest the juvenile court's finding that termination of her parental rights was in the child's best interests.

evidence to support termination based on the fifteen-month time-in-care ground.

**¶16** Despite Mother's assertions that she recently obtained employment at a telemarketing company and was attempting to secure low-income housing, documentation relating to such efforts was not presented to the court. As to housing, Palko stated that to the best of her knowledge, Mother continued to reside with Father, which was a significant concern for DCS given Father's lack of participation and progress in this case. Further, recent domestic violence between Mother and Father raised new concerns about their relationship and Mother's ability to successfully parent her child in a safe, healthy, and stable environment.

**¶17** Regarding individual therapy, Mother attended many sessions. However, DCS's most recent progress report states that Mother was assigned a therapist by DCS on March 6, 2014 and missed four appointments in 2014 and six appointments in 2015. More importantly, Palko testified that the last therapist could not close Mother out successfully because she did not feel that Mother had made the necessary behavioral changes.

**¶18** Mother contends that her low reading level contributed to her inability to complete her parent aid assignments and caused her to close out unsuccessfully in her parent aid and therapy services. Mother, however, testified that she was able to understand the things that people have asked her to read, including the information contained in the court forms.

**¶19** Additionally, even though Mother demonstrated her willingness and ability to engage in reunification services, Mother's poor choices erected more barriers to reunification. DCS presented evidence that Mother and her parents admitted to police that they were knowingly harboring M.H., Mother's niece, that had been reported as missing by DCS in 2014. Mother told police that M.H. had "rotting teeth that are really bad and that she often took Orajel for the pain." Palko confirmed that M.H. was found to be severely neglected and in constant pain from tooth decay with "her tooth nerve being exposed." Palko testified further that Mother continues to reside with her parents, notwithstanding that DCS had repeatedly informed Mother of the need to have her own housing, without the negative influence of her parents. Further, Palko stated that after twenty-nine months of DCS offering services to her, including therapy for several months, Mother was unable to understand why it was detrimental for her child to live with her parents, who were abusing illegal substances.

Palko also testified that DCS had concerns about Mother's inability to protect the child from physical abuse, neglect, and sexual abuse, as well as Mother's inability to provide financially for the child.

¶20　　　Mother made significant efforts to comply with the reunification goals DCS established in this case and completed some of the services provided. However, despite these efforts, the record reflects that Mother failed to remedy the circumstances that led to removal of the child from her care. Specifically, the juvenile court found that Mother had not demonstrated "the behavioral changes needed to provide the child with a safe, healthy, and stable environment." Although Mother presented evidence to the contrary, the juvenile court's duty is to resolve conflicts in the evidence, and we do "not to re-weigh the evidence on review." *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002). Sufficient evidence supports the juvenile court's finding that termination of Mother's parental rights was proper because she would not be able to exercise proper and effective parental control in the near future. Accordingly, the court did not err in granting DCS's amended motion for termination based on fifteen months' out-of-home placement.[2]

## CONCLUSION

¶21　　　We affirm the juvenile court's order terminating Mother's parental rights to the child.



Ruth A. Willingham · Clerk of the Court
F I L E D : AA

---

[2]　　Because we affirm the juvenile court's order based on the fifteen-month ground, we need not address the other grounds asserted in the motion for termination.

7