NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

DELIA G., *Petitioner/Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY,[1] A.B., A.B., A.B.,
*Respondents/Appellees.*

No. 1 CA-JV 14-0187
FILED 11-18-14

---

Appeal from the Superior Court in Maricopa County
No.  JD10911
The Honorable Daniel G. Martin, Judge

**AFFIRMED**

---

COUNSEL

Robert Rosanelli, Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Plaintiff/Appellant*

---

[1]     Pursuant to S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted), the Department of Child Safety is substituted for the Arizona Department of Economic Security in this matter.  *See* ARCAP 27. To maintain consistency with the juvenile court record, however, we refer to ADES (and Child Protective Services (CPS)) throughout the body of our decision.

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Defendant/Appellee Department of Child Services*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Kenton D. Jones joined.

---

**B R O W N**, Judge:

¶1        Delia G. ("Mother") appeals the juvenile court's order terminating her parental rights to her three minor children, ("Child 1" born in 1998, "Child 2" born in 1999, and "Child 3" born in 2001—collectively, "the children").[2]  For the reasons that follow, we affirm.

**BACKGROUND**

¶2        On July 26, 2009, the children accompanied Mother to St. Joseph's Hospital where she was voluntarily admitted for a "nervous breakdown."  Because the children could not remain at the hospital during Mother's psychiatric treatment, hospital staff contacted Dewey B. ("Father")[3] and the paternal grandmother and requested that they care for the children during Mother's hospital stay.  Both Father and grandmother declined, so hospital staff requested that Child Protective Services ("CPS") take custody of the children during Mother's treatment, which ended up lasting seven days.  After they were taken into CPS custody, the children reported that they did not want to be placed with Father because he "hit" Child 1 "a lot."

¶3        Shortly after CPS took custody of the children, the Arizona Department of Economic Security ("ADES") filed a dependency petition alleging Mother was unable to parent due to mental illness and both Mother

---

[2]        Mother also has four adult children, none of whom were subject to this dependency/termination proceeding.

[3]        Although the juvenile court also terminated Father's parental rights to the children, Father is not a party to this appeal.

and Father were unable to parent due to neglect[4] and domestic violence. Following a hearing on January 27, 2010, the juvenile court found the children dependent as to Mother and Father and implemented a case plan of family reunification.

¶4           In furtherance of that case plan, ADES offered Mother parent-aide services, parenting classes, autism support groups (Child 2 was diagnosed as autistic after being taken into CPS custody), couples counseling, family counseling, domestic violence counseling, individual psychotherapy, individual and group dialectical behavioral therapy ("DBT"), a psychological consultation, three psychological evaluations, a psychiatric evaluation, psychological evaluations for the two older children, visitation, and transportation to services and visits. Initially, Mother engaged in numerous services, though her participation was often hostile and combative. Concluding no real progress was being made, ADES filed a motion to terminate Mother and Father's parental rights in March 2011. The case was set for trial, but ADES ultimately withdrew the motion in August 2011. The case plan of family reunification was reinstated and ADES continued providing reunification services.

¶5           In July 2013, ADES filed another motion to terminate Mother and Father's parental rights. As to Mother, ADES alleged that she was unable to discharge her parental responsibilities because of mental illness and that the children had been cared for in a court-ordered out-of-home placement for more than fifteen months.

¶6           The juvenile court held a contested severance hearing over the course of nine days in April 2014. Mother testified that she went to the hospital emergency room in July 2009 because she was experiencing low blood pressure and "low sugar." Following the children's removal from her care, Mother participated in counseling, DBT therapy, parent-aide services, visitation, and autism support groups. Although Mother acknowledged she benefitted from these services, particularly learning to control her emotions through DBT and family therapy, she ceased participating in many of these services by mid-2013. Mother also acknowledged she declined some offered services because in her view they were unnecessary, and she continually refused to take medications

---

4           CPS later determined that Child 1 had not attended school for several years and the other two children had never been enrolled in school. Although Mother and Father asserted the children had been home-schooled, the juvenile court found such assertions were "neither credible nor persuasive."

recommended to treat her mental health issues. Mother further testified that she was unsure of the nature of her future relationship with Father.

¶7 Dr. George Bluth, a licensed psychologist, testified regarding his April 28, 2011 bonding assessment between Mother and the children. Bluth testified that Mother was bonded with the children and the children "seemed to enjoy being with her." He also conducted two psychological evaluations of Mother, however, and concluded that she has "a personality disorder," anxiety, and depression that "substantially interfere with her ability to parent the children" and likely prevent her from providing "a safe and effective home for the children." Bluth expressed concern over Mother's continuing relationship with Father because their relationship is prone to violent conflict. Noting Child 1's borderline IQ and developmental delays and Child 2's autism, Bluth also expressed concern that Mother's mental health issues likely prevent her from meeting her children's special needs. Based on these factors, Bluth recommended that the children not be returned to Mother's care and opined that Mother's mental health issues would require continued treatment for "several years into the future."

¶8 Dr. Beverly Yoches, a clinical psychologist, testified that she met with Mother weekly for individual DBT therapy, with their last visit in July 2013. She explained that Mother quit the therapy after sixteen sessions, believing no progress was being made. Mother also reported she believed CPS was "plotting against her" and expressed a desire to physically assault both her case manager and case manager supervisor. Although Mother's initial therapy sessions were positive, she soon became resistant and began blaming Father, the police, and CPS for her predicament rather than acknowledging any personal responsibility.

¶9 Forensic psychologist Leonard Goodstein testified regarding his evaluation of Child 1. He explained that the child has a borderline IQ between disabled and normal. This child witnessed domestic violence between Mother and Father and was also repeatedly struck with belts by both parents. In addition to the physical abuse, Goodstein opined that Child 1 should not be returned to Mother because Mother depended on the child emotionally in an unhealthy way and relied on the child to keep Mother "out of trouble," which was especially stressful given the child's low-level of intellectual functioning.

¶10 Jenny Bilskie, a CPS case supervisor, testified regarding two incidents of physical abuse. In 2012, Child 1 reported an incident in which Mother had "beat" her with a hanger and other items. In 2013, Child 3

reported that following a domestic incident between Mother and Father, Father left the home and Mother asked Child 3 to "stop him." Child 3 stood in front of Father's parked vehicle to prevent him from leaving, and Father hit the child with the car. In addition to testifying about these incidents of abuse, Bilskie also testified that the children are adoptable and have a relative placement who wishes to adopt them. Bilskie opined that notwithstanding the four years of services, Mother has been unable to stabilize the mental health issues that caused the children to be placed in CPS custody. Bilskie also expressed concern regarding the numerous episodes of domestic abuse the children witnessed between Mother and Father and Mother's denial that such violence occurred. Additionally, Bilskie testified that Mother is presently unable to maintain a stable residence.

¶11 Finally, the CPS progress reports to the juvenile court admitted as exhibits at the hearing reflect that Mother was selective about participating in services and "combative" with service providers when she opted to participate. Mother denied any need to learn parenting skills and repeatedly exhibited emotional outbursts when visiting the children. Because Mother refused to comply with visitation guidelines, several visits were terminated prematurely. All of the children reported being beaten by both Mother and Father. Between March 14, 2012, and February 21, 2013, police officers were dispatched to Mother's residence 27 times to respond to requests for welfare checks and domestic violence. As of June 27, 2013, Mother reported she no longer has stable housing and has resorted to staying with her mother and intermittently with friends.

¶12 After taking the matter under advisement, the juvenile court granted ADES's motion to terminate Mother's parental rights on both of the grounds alleged, finding, in relevant part:

> All of the children share a common exposure to domestic violence and physical abuse.
>
> . . . .
>
> Both parents denied domestic violence, notwithstanding the children's disclosures and other, corroborating evidence (among other things, Mother acknowledged that Father hit both her and the children, and at one point in 2010 obtained an Order of Protection against Father).
>
> . . . .

The overwhelming weight of the evidence demonstrated that Mother has significant mental health conditions that substantially interfere with her ability to effectively parent her children, particularly [the two oldest children]. Since the removal of the children in 2009, the Department has offered Mother multiple services in an effort to address Mother's mental illness, but she has consistently neglected or refused to meaningfully participate in those services. Mother does not even acknowledge that she has a mental health condition, thus making her engagement in services particularly problematic.

. . . .

The Department met its burden to prove, by clear and convincing evidence, the ground of fifteen months out-of-home placement as to Mother[.] The evidence demonstrated that the children have been in an out-of-home placement for a cumulative total period well in excess of fifteen months pursuant to court order. As set forth above, the Department has made diligent efforts over an almost five year period to provide appropriate reunification services to the parents; however, [Mother] has [not] been able to make the necessary behavioral changes to remedy the circumstances that cause the children to be in an out-of-home placement. Based on the evidence presented, the Court concludes that [Mother] will [not] be capable of exercising proper and effective parental care and control in the near future.

The court also found that termination of Mother's parental rights would be in the children's best interests. Mother timely appealed.

## DISCUSSION

¶13        To terminate parental rights, the juvenile court must find by clear and convincing evidence the existence of at least one of the statutory grounds for termination enumerated in Arizona Revised Statutes ("A.R.S.") section 8-533(B) and must find by a preponderance of the evidence that termination would serve the child's best interests. Ariz. R.P. Juv. Ct. 66(C); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12, 995 P.2d 682, 685 (2000). We affirm a court's order terminating a parent's rights unless we conclude, as a matter of law, that no reasonable person could find the essential elements proven by the prescribed evidentiary standard. *See*

*Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 94-95, ¶¶ 6, 9-10, 210 P.3d 1263, 1265-66 (App. 2009). On review, we consider the evidence in the light most favorable to upholding the judgment. *Id.* at ¶ 10. Finally, if "clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3, 53 P.3d 203, 205 (App. 2002).

¶14 Mother challenges the juvenile court's finding that she failed to remedy the circumstances that caused the children's out-of-home placement. Specifically, Mother asserts she "participated in years of services," has "addressed the significant issues that she once had," and has "resolved her issues to the extent that she is able to adequately and effectively parent her children."[5]

¶15 To justify termination of parental rights under A.R.S. § 8-533(B)(8)(c), ADES must prove the child has been in a court-ordered, out-of-home placement for fifteen months or longer, the parent has been unable to remedy the circumstances which led to the out-of-home placement; and there is a substantial likelihood that the parent will be incapable of providing "proper and effective parental care and control in the near future." In determining whether the parent has been able to remedy the circumstances leading to the out-of-home placement, we consider the "circumstances existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her own children." *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22, 152 P.3d 1209, 1213 (App. 2007) (internal quotation omitted).

¶16 The dependency petition alleged that Mother was unable to parent based on her mental illness and due to domestic violence. In connection with its obligation to provide reunification services, ADES requested that Mother demonstrate (1) stability regarding her mental health; (2) the ability to respond properly to the children's needs for protection, safety, and housing; and (3) knowledge of the children's diagnoses and ability to parent children with special needs along with proper interaction with the children and competent supervision.

---

[5] ADES is also required to establish that it made diligent efforts to provide appropriate reunification services. A.R.S. § 8-533(B)(8). Mother does not challenge the juvenile court's finding that ADES made reasonable efforts to reunify the family.

¶17 The record reflects that Mother participated in numerous services, including parent-aide services, individual and family counseling, DBT therapy, psychological evaluations, and visitation. However, for many of the services, Mother's participation was not meaningful, but "combative" and hostile. By Mother's own admission, she refused to participate in several offered services because she deemed them unnecessary. Mother also terminated her DBT therapy prematurely, and although she participated in visitation, some visits were cut short because she violated visitation protocols.

¶18 In addition, the record reflects that Mother failed to acknowledge any mental health issues or domestic violence. At trial, Mother testified that she was admitted to St. Joseph's hospital in 2009 to treat her diabetes and low-blood pressure rather than to seek psychiatric care. Dr. Bluth specifically noted that Mother had "poor insight" regarding her problems and instead blamed others. Mother informed Dr. Yoches that she believed CPS was "plotting against her" and her children were taken away because of CPS, the police, and Father. Mother testified she was uncertain regarding her future relationship with Father, and the record reflects the domestic violence that contributed to the children's out-of-home placement is still unresolved as police were dispatched to Mother's home repeatedly within a year's time to respond to requests for welfare checks and to address domestic disputes. Finally, the record reflects that Mother has no stable housing and is intermittently living with her mother and friends.

¶19 In its termination order, the juvenile court made detailed factual findings, which are well supported by the record. The court also properly applied the law to such findings. We therefore conclude that reasonable evidence supports the court's decision that Mother failed to remedy the circumstances causing the children's court-ordered out-of-home placement.[6]

---

[6] Because we conclude the juvenile court properly found a statutory basis to terminate Mother's parental rights pursuant to A.R.S. § 8-533(B)(8)(c) (fifteen month out-of-home placement), we need not address the court's additional finding of a statutory basis to terminate parental rights under A.R.S. § 8-533(B)(3) (mental health). Furthermore, Mother has not challenged the court's finding that termination of her parental rights is in the children's best interests, and we therefore do not address it.

**CONCLUSION**

¶20 We affirm the juvenile court's order terminating Mother's parental rights to the children.



Ruth A. Willingham · Clerk of the Court
FILED: jt