NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

CHRISTOPHER H., ARXIT B.,
*Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY,
K.H., C.H., X.H., A.H., A.H.,
*Appellees*.

No. 1 CA-JV 17-0167
FILED 10-10-2017

Appeal from the Superior Court in Maricopa County
No. JD28479
The Honorable Jeanne M. Garcia, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli, Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant Father*

Law Office of H. Clark Jones, LLC, Mesa
By Clark Jones
*Counsel for Appellant Mother*

Arizona Attorney General's Office, Phoenix
By Amber E. Pershon
*Counsel for Appellee DCS*

_____

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Maria Elena Cruz joined.

_____

J O H N S E N, Judge:

¶1            Arxit B. ("Mother") and Christopher H. ("Father") appeal the superior court's order terminating their parental rights to their five children. For the following reasons, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2            Mother and Father are the parents of five children: a daughter born in January 2007; sons born in December 2007, June 2009, and August 2010; and a daughter born in November 2014.[1]  The parents were first reported to the Department of Child Safety ("DCS") in July 2013; an anonymous caller reported the home reeked so strongly of urine, feces and garbage that it "knocks you over."  The caller also reported the children were dirty and perhaps unfed.  According to Mother, DCS went to the home and opened a case, but there is no record that the agency took any other action.

¶3            DCS lost track of the family until May 2014, when the agency received a report that the parents had left the children—filthy and hungry—with the children's maternal grandmother because the parents were homeless and living in a car.  DCS then filed a dependency petition alleging Mother and Father were failing to provide a safe and stable home for the children.  According to the petition, the parents' prior homes had been "filthy and lacking food," and that "[u]pon removal, the children were filthy and smelled of urine."  The petition further alleged that the family had most recently been living together in a car; both parents recently had been arrested and Mother was currently incarcerated; Father smoked marijuana illegally; and neither parent had means to support children.  The court issued a temporary order placing the children in the custody of their

_____

[1]      We view the facts and draw all reasonable inferences in the light most favorable to upholding the superior court's order.  *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 13 (App. 2002).

grandmother. It later found the children dependent, affirmed its temporary placement order and ordered a plan of reunification.[2]

¶4 During the dependency, the parents participated in various services with mixed success. Mother submitted to drug tests, all of which were negative. Father later submitted to drug testing and consistently tested positive for marijuana, although he had a medical marijuana card by the time of some or all of the tests. Father completed a drug treatment program, and both parents completed a teen parenting program.

¶5 The parents participated in a parent-aide program, but were closed out of the program unsuccessfully because they were "too passive to redirect the kids" and "failed to address bigger behavioral issues." For example, on one occasion, their children disobeyed adults and inappropriately rode scooters indoors, and the parents did not intervene. On another occasion, the parents did not discipline one of their children who, after not allowed to have a small toy he wanted, threw plastic trash at Father's face at close range while screaming "that's why I don't like you." The parents failed to attend many parent-aide sessions; in the last month that they did participate, they "consistently needed to cancel one visit a week" and hadn't been able to "progress due to lack of attendance."

¶6 The parents participated in some supervised visits but not others. The parents turned down visits at the grandmother's house, including visits on holidays and the children's birthdays, which made the children "feel as if the parents do not care for them at all," according to the caseworker. Additionally, the parents did not take advantage of visits offered to make up for some visits lost due to the agency's mistake. Finally, the parents cancelled supervised visits when they did not have money to entertain the children with fun activities.

¶7 DCS had particular concern about foul smells in the parents' residences. One child told a caseworker that "she does not like the smell in parent's [sic] home," and the "parents' house smells of urine and has cockroaches in the bed sheets when they would visit." A DCS caseworker who checked the home the parents were occupying on October 6, 2016, encountered a smell of bleach so strong that the caseworker became dizzy upon opening the front door. In addition, the kitchen smelled strongly of a dead animal. Concluding the house was not a safe environment for the

---

[2] After the parents' youngest daughter was born later in 2014, the court found her dependent.

children, DCS did not approve overnight visits in the home, but only allowed supervised visits in the home for a brief time.

¶8          The parents admitted there were smells in various houses they had lived in but minimized them.  Father acknowledged to DCS's psychologist that feces were on the floor of their home at the time of the July 2013 report to DCS but said they were dog feces, not human feces, even though the family did not have a dog.  Mother admitted there were smells in another house the parents rented for a few months but attributed the smells to "old plumbing," a sink that flooded, a "bad toilet" and "mildew." Mother also testified that the grandmother fabricated the reports of urine and feces on the floor.

¶9          Mother testified that their current home smelled of a dead animal because a cat had died in the attic.  Mother had heard the cat scratching in the attic, looked outside and noticed an unblocked air vent, and asked the landlord to block the opening; when that happened, the cat was trapped in the attic.  Asked why she had not taken further steps to remedy the resulting stench, Mother said it was "because, you know, each person got a different smell to everything.  Everybody nose is immune to something totally, totally different."

¶10         The smell of marijuana in the home also concerned DCS.  One child told the caseworker that the smell of marijuana lingers in the parents' home and she does not like it.  During the October 2016 home check, the parents' bedroom smelled of marijuana.  Father insisted he did not smoke in the house but the bedroom "smelled like a skunk," according to the caseworker.

¶11         Dr. Al Silberman, a psychologist, examined both parents in March 2015.  Silberman noted that Mother's responses "suggest that she is satisfied with herself as she is" and "sees little need for changes in her behavior." According to Silberman, Mother did not feel that she had to make parenting changes because she thought the grandmother or others had fabricated the charges against her, including how dirty the house was.  She denied to Silberman that the family was ever homeless or lived in the car, explaining that the children sometimes slept in the car because they would fall asleep on the way home from her work. She said that "everyone was knocking her." On whether Mother would be able to adequately parent in the foreseeable future, Silberman assigned her a prognosis of "poor to cautious." He noted that "the major reason why the children should not be returned [is] because [Mother] doesn't understand the changes she needs to make."

¶12 Silberman concluded Father is an extremely defensive person who "minimizes difficulties with cleanliness and marijuana." Silberman testified he believed Father abused marijuana, which would tend to make a person more sloppy, dirty and unmotivated, and likely contributed to how dirty the home was. Silberman concluded that Father's prognosis for ability to parent in the foreseeable future was "poor," with a possibility for improvement if Father reduced his marijuana use. He predicted it was likely that Father's marijuana use and the unclean conditions in the home would continue, however, because "[Father] doesn't see the problem and denies any difficulties with how the home was described as so filthy" and was not aware of how reliant on marijuana he was.

¶13 On October 23, 2015, DCS successfully moved to change the case plan from reunification to severance and adoption, and the superior court ordered it to file a severance motion, which DCS filed. After a severance hearing conducted over three days in November 2016 and January 2017, the superior court terminated Mother's and Father's parental rights on the ground of 15 months' time-in-care under Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(c) (2017).[3] We have jurisdiction over the parents' timely appeals pursuant to A.R.S. §§ 8-235(A) (2017), 12-120.21(A)(1) (2017) and -2101(A)(1) (2017).

## DISCUSSION

### A. Legal Principles.

¶14 Before it may sever a parent-child relationship, the superior court must find clear and convincing evidence of at least one ground for severance set out in A.R.S. § 8-533(B). *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). Additionally, the court must find by a preponderance of the evidence that severance serves the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).

¶15 We review a severance order for abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). "Because the juvenile court is in the best position to weigh evidence and assess witness credibility, we accept the juvenile court's findings of fact if reasonable evidence and inferences support them, and will affirm a

---

[3] Absent material revision after the relevant date, we cite a statute's current version.

severance order unless it is clearly erroneous." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016) (citation omitted).

## B.    Time-in-Care Grounds for Severance.

¶16    Under the time-in-care ground for severance, parental rights may be terminated if (1) "[t]he child has been in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to court order," (2) "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement," and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). The circumstances at issue are "those circumstances existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children." *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007) (citations and quotation omitted).

¶17    The superior court found, and neither parent contests, that the children have been in an out-of-home placement for a cumulative total of 15 months or longer. Nor does either parent contest the court's finding that severance is in the children's best interests. Both parents argue, however, that they have remedied the circumstances causing out-of-home placement and contend it is substantially likely that they will be able to exercise proper and effective parental care and control in the near future.

¶18    The superior court rested its finding that the circumstances causing out-of-home placement had not been remedied on three bases: (1) the parents' persistent failure to keep a clean home; (2) Father's chronic marijuana use; and (3) the parents' demonstrated inability to control the children's behavior. The court further found it unlikely that the parents would be able to adequately parent in the near future because they did not acknowledge that they had failed to adequately parent in the past.

¶19    The superior court's conclusion that cleanliness was still a problem is reasonably supported by the evidence. The court found that several different homes the parents occupied had been plagued by foul smells and concluded that this was "not a coincidence"—the parents had been irresponsible in not repairing the problems. Mother disputes the court's finding, arguing that "the parents *did* investigate, attempt to resolve, and eventually overcome all of the Department's various complaints about the parents' housing." Father states that "concerns about the cleanliness of their residence . . . have been addressed." But Mother's testimony suggested

she and Father took few actions to remedy the bad smells. For example, the most recent bad smell caused by the dead cat decomposing in the attic was apparently left to resolve itself over time. While Mother claimed she was impervious to the foul odor, the court reasonably could have concluded that because the parents recently failed to remedy the stench of a dead animal in the home, they likely would not always provide a clean and livable home for the children in the future. In any event, the court was in the best position to evaluate the credibility of the parents in this regard.

¶20 Likewise, the superior court heard sufficient evidence of Father's continued marijuana abuse to overcome Father's argument that he had "addressed" any concerns about his marijuana use. Father admitted to using marijuana illegally beginning at age 19 and tested positive for marijuana on every drug test during the dependency. While the DCS drug tests ended in May 2016, the caseworker reported a strong smell of marijuana in the parents' bedroom in October 2016, little more than a month before the severance hearing commenced. On a subsequent home check a few weeks later—the last home check before trial—CPS employees were not permitted to enter the bedroom to check if the smell was still present because Mother was sleeping in the bedroom. Furthermore, the superior court had reason to believe that Father's marijuana use negatively affects his ability to parent, given the psychologist's testimony that marijuana use correlates with laziness, sloppiness and lack of motivation.

¶21 Mother argues on appeal that Father's marijuana use is privileged under A.R.S. § 36-2813(D) (2017), which provides that a medical marijuana cardholder may not be denied various parenting rights for conduct allowed under Arizona's Medical Marijuana Act. However, although Father apparently had a valid medical marijuana card at one time during the dependency, at trial, Mother testified that he no longer had one. Even assuming Father was once privileged to use medical marijuana as the law allows, the superior court did not abuse its discretion in considering that he illegally used marijuana before and after he had a valid card. *See State v. Fields*, 232 Ariz. 265, 269, ¶ 13 (App. 2013) (presumption that marijuana use is privileged medical use only applies to valid cardholders); *see also* A.R.S. § 36-2801(2) (2017) (defining "cardholder" as a qualifying patient who "possesses a valid registry identification card"). More importantly, the severance order was not based merely on Father's illegal use of marijuana, but rather on the adverse impact of that illegal use on his ability to parent and the safety and well-being of the children.

¶22 The court's finding that the parents were not able to control their children's behaviors also is supported by reasonable evidence,

including reports of multiple incidents of the parents not disciplining a disobedient child, the parents' failure to regularly attend parent-aide sessions, the fact that the parent-aide service was closed out unsuccessfully, and the fact that the parents cancelled supervised visits when they did not have money for activities that would entertain the children.

¶23　　　　Furthermore, reasonable evidence supports the superior court's finding that it was substantially likely that the parents will not be able to exercise proper and effective parental care and control in the near future. Substantial evidence exists that both parents are in denial about their past parenting failures. The psychologist reported and testified that both parents were defensive and unwilling to acknowledge specific parenting failures. Accordingly, he concluded that Mother's outlook for being able to parent in the near future was "poor to cautious" and Father's was "poor."

¶24　　　　Mother's testimony provides reasonable support for the court's finding that she remained in denial about her shortcomings as a parent. While Mother cites some examples in which she acknowledged at trial that she had made errors, she also denied at trial that her mistakes reflected poorly on her parenting skills, and suggested at times that her errors were excusable. For example, when Mother testified that she "fell short," she immediately defended herself and rationalized her poor parenting by saying that she was working at the time. On another occasion when Mother admitted she fell short, she quickly added that despite any shortcoming, DCS's decision to remove the children was "bogus." When Mother said that "[y]eah, my house may have been messy," it was directly after saying, "I never put my children in no unsafe environment."

¶25　　　　Mother suggests that the superior court's acknowledgement that she had made substantial strides in improving her parenting ability over the course of the case required the court to deny severance. But some improvement by a parent does not require the court to find that the parent will be effective in the near future. *See Matter of Appeal in Maricopa County Juvenile Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994) (upholding severance where parent's successful efforts to overcome drug addiction were "too little, too late").

**CONCLUSION**

**¶26** For the foregoing reasons, we affirm the superior court's order severing Mother's and Father's parental relationships with their five children.



AMY M. WOOD • Clerk of the Court
FILED: AA