NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

DAWN B., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, R.D., R.D., *Appellees*.

No. 1 CA-JV 19-0331

FILED 8-20-2020

Appeal from the Superior Court in Maricopa County
No. JD 504987
The Honorable David K. Udall, Judge

**AFFRIMED**

COUNSEL

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Thomas Jose
*Counsel for Appellee, Department of Child Safety*

―――――――――――――――――

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Lawrence F. Winthrop and Chief Judge Peter B. Swann[1] joined.

―――――――――――――――――

**C A M P B E L L**, Judge:

¶1        Dawn B. ("Mother") appeals from the juvenile court's order terminating her parental rights to her sons, John and Jack[2], ages 8 and 5, respectively ("the boys"). Because sufficient evidence supports the juvenile court's order, we affirm.

**BACKGROUND**

¶2        Mother has had an extensive 20-year history with the Department of Child Safety ("DCS").[3] In March 2016, DCS received a report that Mother had neglected the boys and four of their sisters ("the children"), ages 1 to 10, by leaving them in the care of her roommates who used methamphetamine, and that one of the children's fathers, Curtis, had hit Mother in the jaw. Mother and Curtis had a history of domestic violence. In addition, the report alleged that Mother had a history of abusing Percocet.

¶3        A DCS case manager went to Mother's home in late March 2016 and observed that although the home was adequately clean, the children were extremely dirty. Mother denied that she and Curtis had a history of domestic violence, but admitted to a history of domestic violence with another of the children's fathers, Robert, from whom she had been separated for two years. Mother denied taking Percocet and denied that her roommates used methamphetamine. Mother told the investigator that she and Curtis had ended their relationship and he was no longer living in the

―――――――――――――――――

[1]        Chief Judge Peter B. Swann replaces the Honorable Kenton D. Jones, who was originally assigned to this panel. Judge Swann has read the briefs and reviewed the record.

[2]        The children's names have been replaced by pseudonyms to protect their identities.

[3]        Prior to terminating Mother's parental rights to the boys and four of their sisters in this matter, the juvenile court terminated her parental rights to four older children.

home. The case manager asked Mother to take a drug test. She did not comply.

¶4            Later that month, the case manager spoke with Mother again. Because the children had reported that Curtis was back in the home, the case manager expressed her concern about continuing domestic violence. Mother again denied there had been domestic violence between herself and Curtis.

¶5            The DCS case manager interviewed one of the boys' sisters. She reported that Curtis had stabbed Mother in the face with a screwdriver, requiring medical attention. She told the case manager that four "uncles" lived with the children and Mother, but she did not know the names of two of the men.

¶6            DCS interviewed the father, Robert, in early April 2016. Robert told the case manager that Mother disclosed to him that Curtis had hit her and smashed her television. Robert disclosed that he had recently used methamphetamine "with the guys in [Mother's] house." Also in April 2016, Mother reported that Curtis had beaten her up and that she had had to go to the hospital. Mother, who had a history of methamphetamine use, also reported she had relapsed and used methamphetamine for about two weeks in April 2016.

¶7            DCS took custody of the children in April 2016. All of the children were bruised and infested with lice. DCS filed a dependency petition and the juvenile court found the children dependent in July 2016. The court adopted a concurrent case plan of reunification and severance and adoption.

¶8            Mother was on probation for past criminal convictions and was required to obtain substance abuse services at TERROS at the time of the children's removal. An intake assessment at TERROS recommended that Mother undergo a psychiatric evaluation and begin standard outpatient drug treatment ("SOP"). Mother did not complete SOP or a psychiatric evaluation and TERROS terminated services for lack of participation. DCS again referred Mother to TERROS in June 2016, but she failed to complete an intake assessment and was again terminated from services. Mother was required to call in to TASC daily from June to September 2016 for drug testing. She missed multiple tests during that time period.

¶9            DCS referred Mother to TERROS for a third time in August 2016 and she finally completed an intake assessment in October 2016.

TERROS did not recommend any services for Mother at that time. A DCS supervisor testified that TERROS will not refer a client for services if they deny using drugs, as Mother had done, and there was no recent positive drug test.

¶10        In June 2016, a parent aide began supervising visits between Mother and children in her home. The parent aide noted that Mother had trouble managing the children, that she appeared frustrated at times, and that she yelled at them. In addition, Mother did not demonstrate appropriate boundaries in her interactions with the children. She missed numerous visits in the fall of 2016, and the parent aide noted that Mother was unwilling or unable to make needed behavioral changes in the six months she had received parent aide services. In December 2016, Mother was terminated from parent aide services, "due to her minimal engagement and [for] not making behavioral changes." After the closure, Comtrans supervised Mother's visitation with the children. During those visits, Mother reportedly got frustrated with the children and yelled loudly at them at times. Subsequently, DCS provided another referral for parent aide services, which Mother successfully completed.

¶11        In August 2016, Mother participated in a psychological evaluation with Dr. Sandra Graff. Mother told Dr. Graff that she had used methamphetamine from 2001 to 2006, and that she had lost four of her children in 2003 "to DCS because of meth." Dr. Graff diagnosed Mother with unspecified intellectual disability (63 IQ), severe major depressive disorder, opioid use disorder, and stimulant use disorder (amphetamine type substance), in remission. Dr. Graff's prognosis for Mother's "ability to understand and actualize newly-learned behaviors of any kind would be guarded to poor, according to testing." Dr. Graff noted that Mother "may be more focused on her relationships with men than on the nurturance and protection of her children." Dr. Graff concluded that a child would be at risk in Mother's care.

¶12        In September 2016, DCS referred Mother for family counseling, therapeutic visitation with the children, and individual counseling. She was required to call in to TASC daily from October to December 2016 for random drug testing. She missed multiple tests and frequently failed to call in, but tested negative for substances once in November. Mother was again required to call in to TASC for random drug testing from February to May 2017. She called in more consistently during this period and tested negative for illegal substances.

¶13        Mother completed a psychiatric evaluation in March 2017. The evaluator diagnosed Mother with an unspecified depressive disorder and prescribed her medication for depression. In August 2017, Mother completed a ten-hour parenting class. DCS again referred Mother for individual counseling and family therapy in November 2017.

¶14        Mother was required to call in daily to TASC from August 2017 to October 2018. Mother failed to call in on multiple occasions and missed at least 12 tests but tested negative for substances more than 40 times during this period. Mother tested positive for opiates 11 times, but provided DCS with a prescription for morphine. Mother was required to call in to PSI daily for drug testing from October 2018 to August 2019. She missed three tests but tested negative for substances 25 times.

¶15        In April 2018, DCS filed a motion to place the boys and one of their sisters in Mother's physical custody, over the objection of the children's guardian ad litem. Mother began having unsupervised visitation with the boys and the sister in her home. However, DCS withdrew its motion and discontinued overnight visitation after discovering that Mother had allowed another man, Gary, to live with her.[4] DCS had informed Mother that Gary was not allowed to be around the children because of his history with DCS, including having his parental rights to one of Mother's older children terminated, as well as concerns about his mental health and substance abuse. In addition, the children had expressed a desire not to have any contact with Gary and Mother had instructed them to lie about his presence in the home.

¶16        In January 2019, Mother filed a motion to return the children to her care. *See* Ariz. R.P. Juv. Ct. 59. After an evidentiary hearing, the juvenile court found that although Mother had been compliant with the case plan, her relationship with Gary posed a threat to the children's welfare. The court further found that Mother did not have the finances to support herself and the children, as evidenced in part by the fact that she had lied to a foster placement about being pregnant in order to obtain money from them on multiple occasions.

¶17        Mother was required to call in for drug testing from January to early March 2019. She failed to call in 48 times during that time period but tested negative for illegal substances on 5 occasions in January.

---

[4]        Mother posted on Facebook that she was engaged to Gary.

¶18 In February 2019, DCS referred Mother for supervised visit-only parent aide services. These services were terminated after the parent aide transported two of the children to Mother's home and discovered that she was in jail and that Gary was in the home. In March 2019, Mother was released from jail. DCS was concerned that Mother was using methamphetamine again and asked her to submit to hair follicle testing. Mother submitted two hair follicle tests that month. Both tests were positive for amphetamine and methamphetamine, indicating chronic drug use as opposed to a one or two-time use. Despite the positive tests, Mother denied using methamphetamine.

¶19 In April 2019, police contacted DCS and informed the agency that an unnamed individual who had been staying with Mother had been arrested for having drugs. DCS filed a motion to terminate Mother's parental rights to all six of the children on the grounds of fifteen months' time in care and her history of chronic abuse of dangerous drugs, controlled substances, or alcohol. *See* A.R.S. §§ 8-533(B)(8)(c), (B)(3).

¶20 After missing two appointments, Mother completed a psychological evaluation with Dr. James Thal in May 2019. Dr. Thal diagnosed Mother with an intellectual disability (65 IQ), adjustment disorder, unspecified personality disorder with dependent traits, stimulant use disorder, and opioid use disorder. Dr. Thal noted that when he asked Mother whether methamphetamine had any negative effects, she denied that it did, despite having lost her front teeth due to methamphetamine-induced decay. Mother told Dr. Thal that one of her daughters had disclosed that Robert had molested her and that he failed a polygraph examination, but Mother did not believe the abuse occurred. She believed that DCS had "tricked" the children into making false allegations. Mother was still married to Robert at the time of the evaluation.

¶21 Dr. Thal opined that Mother's "mental deficiency, along with a troubling propensity to become involved in dysfunctional relationships," precluded her from being a safe and effective parent. Dr. Thal concluded that Mother's prognosis for becoming a minimally adequate parent was poor, that a child would be at risk for neglect in her care, and that the children could not be safely returned to Mother. Dr. Thal concluded that further reunification services would not likely be productive.

¶22 In August 2019, Mother asked DCS to allow Gary to visit with the children. DCS denied the request. Mother made a second motion to place the boys with her in September 2019, and the juvenile court denied

the motion. At some point in 2019, Mother was terminated from individual counseling services because of her lack of contact with the therapist.

¶23        The court held a two-day termination trial in September 2019. Mother contested termination only regarding the boys and pled no contest to the termination of her rights to their sisters. Mother testified that she was still married to Robert and indicated that she did not know whether she would remain married to him. When asked what she would tell Gary if he wanted to move back in with her, she stated it "probably" would not happen and that she would tell Gary "I got to get with my kids first for a while." DCS program supervisor Kyla Gordon testified that Mother's inability to pick safe partners had been a chronic issue in this dependency case as well as in Mother's previous dependency cases, and that "[t]he children have been exposed to people [who] are not safe and put them in great danger." The juvenile court terminated Mother's parental rights to the children on both of the alleged grounds and found that severance was in their best interests.[5] Mother timely appealed.

**DISCUSSION**

¶24        Mother argues that insufficient evidence supported the juvenile court's finding that termination was warranted for out-of-home placement pursuant to A.R.S. § 8-533(B)(8)(c). The juvenile court may terminate parental rights under A.R.S. § 8-533(B)(8)(c) if DCS has made diligent reunification efforts, the parent has been unable to remedy the circumstances causing the parent's child to be in an out-of-home placement for fifteen months or longer, and "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." We view the evidence and the reasonable inferences to be drawn from it in the light most favorable to affirming the juvenile court's order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). We will not reverse the juvenile court's order unless reasonable evidence does not support the juvenile court's factual findings. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

¶25        The boys had been in an out-of-home placement for more than three years at the start of the severance trial. Mother argues that she remedied the circumstances causing the boys to be in an out-of-home placement because she participated in all of the services offered and demonstrated behavioral changes during the dependency. In making a

---

[5]        The juvenile court also terminated the parental rights of the boys' father, Robert. He is not a party to this appeal.

determination that a parent has been unable to remedy the circumstances causing the child to be in an out-of-home placement, we construe those circumstances to mean the circumstances existing at the time of the severance that prevented a parent from appropriately providing for the parent's child. *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007); *see also Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 17, ¶ 26 (App. 2019) (court must consider "*both the origin [of the dependency] and any cause arising during the dependency*") (emphasis in original).

¶26 Here, the juvenile court found that although DCS made diligent efforts to provide reunification services to Mother, she was unable to remedy the circumstances causing the boys to be in an out-of-home placement. Citing Dr. Thal's opinion, the court found that there was a substantial likelihood that Mother would not be capable of exercising proper and effective parental care and control in the near future due to her intellectual disability.

¶27 Reasonable evidence supports the juvenile court's findings. Dr. Thal evaluated Mother in May 2019, and even though she had engaged in some services, his prognosis that Mother would be able to demonstrate minimally adequate parenting skills was poor in light of her intellectual disability. Dr. Thal also noted that Mother had "not been able to overcome . . . her involvement in dysfunctional and troubled relationships." Dr. Thal opined that Mother lacked the capacity to acquire parenting skills, "maybe most especially in the area of protecting her children."

¶28 Because sufficient evidence supported the juvenile court's finding that severance was warranted pursuant to A.R.S. § 8-533(B)(8)(c), we need not consider Mother's challenge to the alternate ground of chronic substance abuse. *See Jesus M. v. Ariz. Dep't of Econ. Sec*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

¶29 Next, Mother argues that the juvenile court erred by finding that termination of her parental rights was in the boys' best interests. We do not reweigh the evidence and will affirm the juvenile court's factual findings if supported by reasonable evidence. *Dominique M. v. Ariz. Dep't of Child Safety*, 240 Ariz. 96, 97, ¶ 6 (App. 2016). "Although fundamental, parental rights are not inviolate; a court may still sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and also finds by a preponderance of the evidence that severance is in the best interests of the child[]." *Id.* at 98, ¶ 7 (citations omitted). Severance is in a child's best interests if the child would "derive an affirmative benefit from termination or incur a detriment by continuing in

the relationship." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 6 (App. 2004). A current adoptive plan is a well-established affirmative benefit to a child. *Id.*

¶30 Reasonable evidence supported the juvenile court's best interests finding. Jack was in an adoptive placement at the time of trial, and even though John was not, both boys were adoptable, and a previous foster family of John was willing to adopt him.

¶31 Mother argues that she loves the boys, is bonded to them, and she believes the evidence showed she was able to meet their daily needs. In addition, she argues that the boys would not be in danger in her care because she has broken up with Gary. Although the existence of a bond between a parent and child is a factor in assessing best interests, it is not dispositive. *Dominique M.*, 240 Ariz. at 98, ¶ 12. "Even in the face of such a bond, the juvenile court is required to evaluate the totality of circumstances and determine whether severance is in the best interests of the children." *Id.* at 99, ¶ 12. And as discussed above, reasonable evidence supported the severance ground of out-of-home placement and the court's conclusion that Mother would not be a fit parent in the near future, if ever. The juvenile court considered the totality of the circumstances and found that severance was in the boys' best interests. Reasonable evidence supports that finding.

## CONCLUSION

¶32 For the foregoing reasons, we affirm the juvenile court's termination of Mother's parental rights.



AMY M. WOOD • Clerk of the Court
FILED: AA