IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

BRIONNA J., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.V., *Appellees.*

No. 1 CA-JV 21-0039
FILED 5-24-2022

Appeal from the Superior Court in Maricopa County
No. JD530462
The Honorable Connie Contes, Judge *Retired*

**VACATED AND REMANDED**

COUNSEL

Law Office of Ed Johnson PLLC, Peoria
By Edward D. Johnson
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Lauren J. Lowe
*Counsel for Appellee Department of Child Safety*

**OPINION**

Presiding Judge Peter B. Swann delivered the opinion of the court, in which Judge David D. Weinzweig and Judge Paul J. McMurdie joined.

**S W A N N**, Judge:

¶1        In this severance case, we are confronted with the sometimes difficult distinction between a history of bad parenting and grounds that justify the permanent termination of a parent-child relationship by the government.  We hold that even abundant evidence of bad parenting does not necessarily equate to the parental unfitness necessary to justify permanent termination of the parent-child relationship by the state.  In this appeal, we review an order severing Brionna J.'s ("Mother['s]") parental rights under A.R.S. § 8-533(B)(8)(c).  We vacate the severance and remand for further proceedings.  Though Mother was deeply troubled and far from an ideal parent, she improved in response to services and insufficient evidence supported the juvenile court's conclusion that she was unfit.

**FACTS AND PROCEDURAL HISTORY**

¶2        Mother gave birth to A.V. in 2005.[1]  She was thereafter reported to child protective services multiple times over a period of years. In 2006, she was reported for testing positive for marijuana, for engaging in domestic violence with A.V.'s father, and for permitting A.V. to live with her grandmother in a different state.  In 2007, she was reported for not visiting A.V. when the child was hospitalized for pneumonia, for abusing alcohol and illegal drugs, for driving A.V. while under the influence, for leaving drugs and drug paraphernalia in an area accessible to A.V., and for stabbing A.V.'s father and placing A.V. in the road to prevent him from leaving.  In 2008, she was reported for going "clubbing" at night while leaving A.V. in the care of her grandmother, a user of alcohol and illegal drugs who spanked A.V. and often slept while A.V. moved unsupervised around a house containing unsecured chemicals.  In 2011, she was reported for using marijuana in front of A.V., leaving marijuana in an area accessible to A.V., and not taking A.V. to the doctor when the child had a bad cough.

---

[1]        A.V.'s father's parental rights were severed concurrent with Mother's, but he is not a party to this appeal.

In 2013, she was reported for "always [being] mad" and threatening to kill A.V. and herself.

¶3 In this appeal, we are concerned with the current petition and the circumstances giving rise to it. In 2016, Mother was reported to the Arizona Department of Child Safety for having posed as A.V. to send a message to the child's grandmother stating that she (A.V.) had ingested nail polish remover. The Department thereafter assumed custody of A.V., and her best-interests attorney filed a dependency petition in November 2016. The petition alleged that Mother was unable or unwilling to provide necessary parental care and control, *see* A.R.S. § 8-201(15)(a)(i), because:

> Mother has untreated mental health issues[,] . . . has physically abused the child by hitting her[,] . . . swears at the child and calls her derogatory names[,] . . . has a history of substance abuse and keeps drugs accessible to the child[,] . . . has a history of domestic violence and has been arrested and convicted multiple times[,] . . . has prior DCS involvement in the state of Georgia and Arizona[, and] . . . has neglected/and or [sic] abandoned the child by leaving her in the care of the Maternal Grandmother for extended periods of time.

¶4 Mother contested the petition. But she failed to appear at the March 2017 evidentiary hearing, so the court found A.V. dependent as to her on the strength of the petition's allegations and the reports received by the Department.

¶5 The Department offered Mother myriad reunification services. She was not required to participate in substance abuse treatment because she produced a medical marijuana card. She was referred for domestic violence counseling but never participated.

¶6 She did participate in a psychological evaluation in March 2017, which noted suspected child neglect, suspected child physical abuse, and suspected child psychological abuse but resulted in no mental health diagnoses. The psychologist recommended that Mother would benefit from services designed to "increas[e] her frustration tolerance and ability to manage daily stressors." Mother also participated in a bonding and best-interests assessment in May 2017. In that assessment, during which Mother and the grandmother argued in front of A.V., A.V. disclosed to the psychologist that she feared being hurt by Mother when Mother was angry. Concerned that Mother had trouble both controlling her temper and

recognizing that failing, the psychologist opined that anger management or dialectical behavior therapy ("DBT") might be helpful.

¶7        The Department set up DBT for Mother in July 2017, but she did not begin attending that therapy until September 2017.  Her counselor reported that Mother "made behavioral and cognitive improvements." Still, in January 2018, after Mother "lashed out and became emotionally out of control" on two occasions, the therapy was terminated pending Mother's successful completion of an anger management program.  Mother was referred for an anger management program, but the referral was closed due to her "lack of cooperation and resistance to treatment."  Mother ultimately self-referred for DBT with a different provider in mid-2018, participated in the therapy, and reported completing the program later that year.  She further provided a certificate of completion for a one-day self-referred anger management course in late 2018, and she reported in late 2019 that she had self-referred for an anger management program.

¶8        Mother did not begin participating in parenting-skill sessions until late 2017.  She stopped participating in visits for a time in late 2017 after her threatening behavior toward the parent aide caused the visits to be moved from her home to the community.  In a January 2018 summary report, the parent aide noted that Mother "struggles with acknowledging how responding to [A.V.] in a loud, aggressive, belittling, impatient, badgering, tone places the child in a vulnerable emotional state and causes the child to support and care for [M]other placing [A.V.] in a[n] inappropriate family role."  The parent aide further observed that Mother was "unpredictable as to . . . act[ing] out due to being trigger[ed] by something [A.V.], family members, or state workers say or do, whether founded or not," that Mother appeared "to have no self regulation once she is angered," and that Mother had indicated "she is only doing things to get her daughter back not because she feels there is a need to change."

¶9        A.V. underwent a psychological evaluation in February 2018 in response to concerns that she was lying, stealing, and threatening suicide.  The psychologist opined that "there are highly likely issues with anger, sadness, and fear," and that A.V. acted out in response to her repressed feelings "connected to being abused and neglected."  The psychologist recommended that A.V. continue supervised visitation with Mother.

¶10        In April 2018, Mother underwent a second psychological evaluation that led to a rule-out personality disorder diagnosis.  The psychologist opined that though Mother appeared to believe she could

regulate her emotions, the collateral information indicated otherwise. The parent aide's progress reports from March to July 2018, however, reflected that Mother had actively worked on and gained impulse control and self-awareness. And in August 2018, she was successfully discharged from parent aide services.

¶11        At supervised visits in late 2018, Mother argued with A.V. on several occasions. And  on one occasion, when her location request was denied, Mother refused the visit and began clapping and dancing around the case aide as A.V. watched. At one visit, the case aide reported that Mother spoke "sarcastically" toward A.V., repeatedly touched A.V.'s hair over A.V.'s objection, recorded A.V. over A.V.'s objection, grabbed A.V.'s chin while addressing her "sarcastically," and twice threatened to end the visit early. At another visit, after A.V. failed to comply with Mother's direction to do homework, Mother yelled at A.V., raised the issue of the dependency case's origin, and hugged A.V. after she requested not to be touched. At other visits, Mother "sarcastically mocked" A.V. for not wanting inexpensive makeup and argued with A.V. about who was supposed to pay a school expense.

¶12        During visits in December 2018 and January 2019, Mother informed A.V. that she would no longer participate in visits based on her dissatisfaction with the court proceedings and A.V.'s contact with her father. Consistent with those statements, Mother stopped participating in visits after the court returned A.V. to her father's physical custody in January 2019. She resumed visits only after A.V. was placed back in the Department's physical custody in May 2019 based on reports of physical abuse and neglect by the father.

¶13        Around the same time, Mother, who took the position that she had completed all necessary services, participated in a Team Decision Meeting with A.V. Mother's disruptive behavior at that meeting led A.V. to yell at her twice, and ultimately Mother was asked to leave early. The case supervisor reported that this was not the only meeting Mother disrupted, though she did not specify whether A.V. was present on those other occasions.

¶14        Mother's resumed visits with A.V. typically went well throughout the remainder of 2019. On one occasion, however, Mother criticized A.V.—who is biracial—for selecting "white kids' shoes." According to the case supervisor, there were "ongoing issues with [A.V.] being torn between races when it comes to her visits with [Mother]." At the next visit, Mother immediately began cursing at the case aide for having

reported her remark, to the point where the case aide removed A.V. and canceled the visit. Mother thereafter refused to participate in visits for a month.

¶15    The Department moved in January 2020 to sever Mother's parental rights under A.R.S. § 8-533(B)(8)(c) , and the matter ultimately was set for trial in November 2020.

¶16    Meanwhile, in March 2020, Mother underwent another psychological evaluation. She was again diagnosed with a personality disorder, as well as rule-out posttraumatic stress disorder, suspected child neglect, and suspected child psychological abuse. The psychologist opined that Mother's prognosis to safely parent was poor due to her inability to control consistently her emotions and behavior despite having completed services.

¶17    In mid-2020, Mother cited unexpected travel to cancel approximately half a month's visits following a pair of negative visits. During the first of those visits, A.V. told Mother that she no longer wanted to be Black, and Mother responded that A.V. would no longer be her child by the next month anyhow. During the second visit, Mother left early after arguing with A.V. about nail polish. In September 2020, the Department reported that "visits remain concerning due to behaviors between both [M]other and [A.V.] They continue to make hurtful statements to each other." The Department further reported that A.V. had requested that visits occur only in the community with her grandmother present.

¶18    Mother began individual counseling in June 2020 but refused to continue after October, when the sessions were switched from a virtual to an in-person format. Mother's visits with A.V. stopped entirely a few weeks before the November 2020 severance trial, at A.V.'s request, because A.V. wished to stop fighting with Mother. The case supervisor reported that Mother would insist on discussing her religious beliefs at visits despite A.V.'s wish not to talk about that topic.

¶19    The case supervisor testified at the severance trial that A.V. could not safely be returned to Mother's care because of "Mother's behavior, her refusal to make any changes, the ongoing conflict between her and [A.V.], her ongoing conflict with service providers, [and] her inability to change her anger." She explained, "It all leads back to her not being willing to identify that she has an anger issue and be successful in trying to make those changes." The supervisor testified that A.V. was in an adoptive placement capable of meeting her needs, was adoptable, and had

finally come to support severance and adoption. The supervisor opined that severance would serve A.V.'s best interests by providing her permanency and she would suffer emotionally if severance were denied.

¶20 Mother testified that she was willing to continue individual counseling online but did not wish to attend in-person because of the COVID-19 pandemic. She acknowledged that she had failed to control her temper in the past, had hurt A.V. by her actions, and had used unnecessarily cruel words. She also acknowledged that she had not been fully cooperative in the case. She stated, however, that she was "not as [she] was before" regarding her temper and that her actions did not warrant severance. She testified that she could care for A.V. and that she believed it was not uncommon for a mother and teenage daughter to have disagreements.

¶21 In February 2021, the superior court granted the Department's severance motion. The court found that severance was warranted under § 8-533(B)(8)(c) because:

> At the onset of the dependency action, Mother was very resistant to services and participated minimally. Mother self-referred for DBT counseling through the VA but continued to demonstrate aggressive, hostile behaviors towards providers and, at times, her daughter. When the child was reunifying with her Father, Mother refused to visit with [A.V.] Following the removal of [A.V.] from Father in April 2019, Mother was invited to a team decision making meeting to discuss prospective kinship placement with the maternal relatives. However, Mother was disruptive throughout the meeting and asked to leave.

> Mother has continued to display volatile and disruptive behaviors with providers throughout the dependency. Mother's mental health condition and diagnoses have persisted for more than four years, which is considered long term. Mother is not amenable to therapy to make necessary behavioral changes. Currently, Mother and daughter are not having visitation so that Mother and daughter stop fighting. Mother has demonstrated she is unable and/or unwilling to appropriately regulate her emotions and safely and effectively parent her daughter.

The court further found that severance was in A.V.'s best interests.

¶22        Mother appeals.

## DISCUSSION

¶23        Mother contends that the Department failed to present sufficient evidence to support termination of her parental rights. Parental rights must not be terminated absent proof by clear and convincing evidence that severance is warranted under A.R.S. § 8-533(B), and proof by a preponderance of the evidence that severance is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). We address only the statutory element today.

¶24        We are not permitted to weigh the evidence. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶ 18 (2018). Even if the facts are sharply disputed, we must accept the juvenile court's findings if supported by reasonable evidence and inferences. *Id.* But we must not affirm a clearly erroneous severance order. *Id.* "[T]he right of parents to the care and custody of their child is a fundamental right" that "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state." *In re Maricopa Cnty. Juv. Action No. JS-6831*, 155 Ariz. 556, 558 (App. 1988) (citation omitted). Accordingly, notwithstanding our deferential standard of review, we must remain mindful that severance, which "is a permanent deprivation, not only o[f] the right to custody but to all contact," *id.* at 559, is "a power of awesome magnitude that must be exercised with great rectitude and always cognizant of the fundamental rights at stake," *Alma S.*, 245 Ariz. at 153, ¶ 26 (Bolick, J., concurring in result). "[W]e should take great care to ensure that our termination of parental rights process has not become a railroad with no stops and only one destination, in which judges act as mere conductors." *Id.* at ¶ 28 (Bolick, J., concurring in result).

¶25        The Department requested, and the court granted, severance under § 8-533(B)(8)(c). Accordingly, severance required clear and convincing evidence that A.V. had been in out-of-home placement for a cumulative total period of at least 15 months, the Department had made a diligent effort to provide appropriate reunification services, Mother had been unable to remedy the circumstances that caused A.V. to be in an out-of-home placement, and there was a substantial likelihood that Mother would not be capable of exercising proper and effective parental care and control in the near future. A.R.S. § 8-533(B)(8)(c); *Michael J.*, 196 Ariz. at 249, ¶ 12.

¶26 Section 8-533(B)(8)(c) serves as a proxy for parental unfitness, *Alma S.*, 245 Ariz. at 150, ¶ 10, that creates harm or risk of harm to the child, *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 229, ¶ 24 (2020). The circumstances that cause the child to be in an out-of-home placement are those "'*existing at the time of the severance*' that prevent a parent from being able to appropriately provide for his or her children." *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007) (emphasis added) (citation omitted). Children's rights include "the right to good physical care, adequate food, shelter and clothing, the right to emotional security, [and] the right to be free from injury and neglect." *Hernandez v. State*, 23 Ariz. App. 32, 35 (1975). But whether a parent can appropriately provide for his or her children, and whether the parent will be capable of exercising proper and effective parental care and control, are necessarily elastic inquiries. *Cf. In re Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 579 (App. 1994) (recognizing, for purposes of severance based on parental abandonment, "[t]erms such as 'reasonable support' and 'normal parental relationship' are of necessity imprecise and . . . the concept of abandonment is somewhat elastic" (citation and internal quotation marks omitted)). We must also consider that children have "the right to be with [their] natural parents." *Hernandez*, 23 Ariz. App. at 35.

¶27 Mother concedes that A.V. was in out-of-home placement for more than 15 months and that the Department made a diligent effort to provide appropriate reunification services. She challenges the sufficiency of the evidence to support the juvenile court's determinations that she was unable to remedy the circumstances that led AV. to be in out-of-home placement and that she would not be capable of exercising proper and effective parental care and control in the near future.

¶28 To be sure, reasonable evidence supports the juvenile court's findings that Mother was initially resistant to and minimally participated in services, that she was aggressive and hostile toward providers and sometimes A.V., that she withheld visits, that she disrupted a team decision making meeting, that she and A.V. were not currently having visits due to fighting, and that she had persistent mental health diagnoses and was not amenable to therapy. We cannot agree, however, that the facts warranted the conclusion that Mother was unable to "safely and effectively parent her daughter." The evidence showed that Mother suffers from a long-term personality disorder and often fails to control her temper and act maturely, including when she interacts with or in the presence of A.V. The evidence showed that on multiple occasions, Mother treated A.V. with disrespect, told her hurtful and inappropriate things, spitefully withheld visits, and interacted belligerently with others, sometimes in A.V.'s presence. She was

far from a model parent. But she was successfully discharged from parent-aide services, and though her continuing conduct was concerning and may have established that she was an unkind and volatile parent, the evidence did not establish that she was unfit. Though the state cites the Department's characterization of Mother's conduct during visits as "explosive," our review of the records detailing those visits belies that description. On this record, even accepting all of the juvenile court's findings of fact, we must hold that the state failed to meet its burden to justify severance under § 8-533(B)(8)(c) and that the juvenile court clearly erred.

¶29 Were this a family court case involving a dispute between parents, we likely would affirm orders restricting Mother's access to the child based on her conduct—but, absent additional evidence, we would not suggest that the matter be referred for severance. Severance is not a general-application tool that allows the state to regulate bad parenting. *See JS-6831*, 155 Ariz. at 558. The draconian consequences of severance (for both parent and child) are appropriate under § 8-533(B)(8)(c) only when the child must be protected from a parent who is incapable of exercising proper and effective care and control. *See Alma S.*, 245 Ariz. at 153, ¶¶ 26, 28 (Bolick, J., concurring in result). Here, we cannot agree that the statutory ground was proved by clear and convincing evidence. The evidence established that Mother was mentally ill, volatile, and unkind, but it did not establish that she was unfit as a matter of law. In so holding, we do not take lightly the inevitable conclusion that Mother's behavior during the dependency contributed to A.V.'s emotional upset and harmed their relationship. But we note that the Department conceded at oral argument on appeal that it did not allege emotional abuse by Mother, and we note that severance was never sought based on neglect or abuse under § 8-533(B)(2), or on mental illness under § 8-533(B)(3). We hold that the severance order must be vacated.

¶30 We stop short, however, of dismissing the dependency.[2] We recognize that the dependency was established based on a showing of parental unfitness under a lesser evidentiary standard than that required for severance. *See* A.R.S. §§ 8-201(15)(a)(i), -844(C)(1); *In re Cochise Cnty. Juv. Action No. 5666-J*, 133 Ariz. 157, 159 (1982). But this record does not compel us to conclude that the dependency was baseless ab initio. *Cf. Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 18–19, ¶¶ 27–30 (App. 2019).

---

[2] We note that Mother did not advocate for dismissal at oral argument on appeal. To the contrary, counsel stated that he "couldn't in good faith say that [the dependency] should be dismissed."

¶31     Ordinarily, when the record establishes that a parent is fit, the proper remedy is dismissal of the dependency.  In *Donald W.*, dismissal was required because the record would have supported no reasonable findings sufficient to continue a dependency.  But not all cases are so clear.  By enacting § 8-538(E), the legislature anticipated that even in cases where termination is not warranted, the best interests of the child might still favor "supplementation" of parental efforts for a time under an appropriate court order.  We therefore remand so that the superior court may evaluate whether continuing government oversight serves A.V.'s best interests.  *See* A.R.S. § 8-538(E) ("If the court does not order termination of the parent-child relationship, it shall dismiss the petition, provided that if the court finds that the best interests of the child require substitution or supplementation of parental care and supervision, the court shall make such orders as it deems necessary."); *see also* Ariz. R.P. Juv. Ct. 66(F)(3) ("At the conclusion of the hearing the court shall . . . [d]eny the termination motion or petition if the moving party or petitioner did not meet its burden of proof, and order the parties to submit a revised case plan prior to the dependency review hearing.").

## CONCLUSION

¶32     We vacate the severance order and remand for further proceedings consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED:     AA