NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO T.G.

No. 1 CA-JV 23-0013
FILED 8-17-2023

Appeal from the Superior Court in Maricopa County
No. JD39777
The Honorable Michael D. Gordon, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Andrew M. Jacobs delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Judge Angela K. Paton joined.

---

**J A C O B S**, Judge:

**¶1** Nimrha C. (Mother) appeals the juvenile court's order terminating her parental relationship with her child, TG, born in October 2006. Because reasonable evidence supports the court's order terminating Mother's parental rights under A.R.S. § 8-533(B)(8)(a), and (c), we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2** On August 10, 2020, the Gila River Police Department responded to a call about Mother driving erratically with her child, fifteen-month-old AM, who is not a party to this appeal. The police saw Mother hit AM. Mother refused to cooperate with police, even using AM as a shield against being tased. Mother smelled of alcohol, and police observed in her car open beer cans, methamphetamine, and a broken methamphetamine pipe. She and AM had apparently been living in her car. Mother was arrested.

**¶3** Although Mother had lived with her parents, she was kicked out by her brother in August 2019 a few months after AM was born and a year before her arrest. TG still lived with his maternal grandparents; most of TG's life had been spent with his maternal grandmother. TG's father, whose parental rights were terminated and is not a party to this appeal, had not contacted TG since he was a baby. TG was bonded with his maternal grandparents, and they were already caring for TG's medical and educational needs.

**¶4** On August 12, 2020, after Mother's arrest, AM was also placed with his maternal grandmother. About a week later, Mother forced her way into the home and took AM. Mother was arrested, and the police found drugs in her car. Mother admitted she was living in her car with AM and driving while under the influence. On August 17, 2020, DCS filed a dependency petition. DCS had not been able to personally serve Mother, but on October 6, 2020, the court found TG and AM dependent as to Mother.

¶5          Mother does not contest the juvenile court's findings that "[a]t the outset of the proceedings, DCS referred Mother for reunification services heavily focusing on substance abuse issues including treatment and testing—and she did not engage." DCS "offered her substance abuse treatment, substance abuse testing . . . supervised visitation," and transportation to services. However, the preliminary protective report reflects that Mother did not see her drug and alcohol use as an issue, despite her current circumstances and history of driving under the influence. The report indicated that there would be weekly supervised visits and a DCS case worker would conduct monthly contact visits at the grandparents' house. However, "Mother remained largely out of contact with [DCS] throughout the dependency proceedings."

¶6          Mother later testified at the termination hearing that her only efforts toward rehabilitation from August 2020 until August 2022 were continuously and unsuccessfully trying to contact her DCS case manager and complaining to the agency about that. Mother did not, however, contact service providers or participate in the case plan despite acknowledging receipt of a service letter from DCS in September 2020, that had a phone number for "the services . . . that [she] needed to do . . . programs and service[s]." Mother acknowledged receiving the letter and going to the identified DCS office to "see what's going on because I don't even know what's going on with my children." The court found "Mother sporadically contacted [DCS]," "and would leave a message but would not return the case manager's follow up calls."

¶7          In January 2021, Mother was living with a friend and working nights at a restaurant for a few months until she quit in March 2021. She did not have another job until September 2021. Meanwhile, however, "Mother's failure to meaningfully engage in any of the services persisted." She did not participate in the permanency planning hearing and report and review hearing in July 2021, or the initial appearance on the termination motion. She also did not appear at the scheduled pretrial conference in September 2021, after which the court held a publication hearing on the termination motion on October 13, 2021, finding it the best means practicable to achieve service.

¶8          Unbeknownst to DCS, for about a month during September and October 2021, Mother had been living in emergency housing at a sober living facility but did not have to drug test while there. She was then arrested in October 2021 on an April 2021 warrant and charged with attempted burglary for an incident that occurred on November 24, 2020.

**¶9** Mother did not appear at the pretrial conference on December 14, 2021. DCS was informed by the placement about Mother and located her in custody in early January 2022 where Mother remained throughout the termination proceedings. Although DCS did not have a way to contact Mother before she was incarcerated, the case manager corresponded with Mother through mail since she was in custody. DCS also scheduled video visitation for Mother supervised by a case aide with AG, but TG did not want visitation.

**¶10** Mother appeared for the first time on the first day of trial, January 24, 2022. The court reappointed her attorney, continued trial, and granted DCS leave to amend the termination petition to add the 15 months out-of-home placement statutory ground for termination. During the three-day termination hearing which concluded on August 25, 2022, the DCS case worker testified about DCS' efforts to connect with Mother and contact her at the numbers she provided. Mother contacted the DCS case worker when the case started, after which they engaged in phone-tag four or five times.

**¶11** Mother testified she formerly used methamphetamine, starting when she was 18 or 19 years old, and used it off and on until approximately May or June 2021. Mother said she relapsed when DCS took AM and within a couple months thereafter was using once a day. Mother denied an alcohol abuse problem and estimated she was sober for three or four months before going to jail in October 2021, while discontinuously experiencing nine total months of sobriety. Mother testified she was not intoxicated or drinking when arrested by the Gila River Police in August 2020 and she could not recall the methamphetamine pipe in the car. Mother also denied having methamphetamine and two drug pipes in the car when she was arrested for taking AM from her parents.

**¶12** Mother testified she had not seen TG since before being taken to jail in October 2021, and by the time of the termination hearing could not remember when she saw TG last before that. Mother explained that TG was living with her parents when the dependency case started, while Mother was living in her car with AM. Mother testified she was recently visiting with AM only:

> because my 15 year old . . . [TG is] still in school. . . . So that's why I haven't been able to see [TG]. I'm not sure if maybe [TG] doesn't want to see me because [TG] doesn't want to cry and stuff like that because of seeing me where I'm at and, you know, but that's about it. I know that [TG is] still in school.

When Mother was asked if she had been told that TG did not want visitation, she testified that she had not spoken for TG for "probably a couple months."

¶13     Mother said she knew she needed to participate in visitation and services, had been reading parenting books on her own because there were no parenting classes in jail, and for several months had been participating in a substance abuse services and support group. Although Mother provided some certificates to DCS for participation in services while in custody, and when first incarcerated she sent coloring books and monthly letters to TG, the DCS case worker testified that TG did not view Mother as a mother and did not want to see her or to start or continue the relationship.

¶14     Mother testified she did not have a place to live upon release from custody but thought she could live in a sober living facility and then get a job and an apartment after about one month. Mother thought she could continue to work at a plastics company or warehouse and had applied to an online retailer before her incarceration.

¶15     The juvenile court found clear and convincing evidence of three statutory grounds sufficient to terminate Mother's parental rights to TG—abandonment under A.R.S. § 8-533(B)(1), 9 months out-of-home placement under § 8-533(B)(8)(a), and 15 months out-of-home placement under § 8-533(B)(8)(c). In determining Mother abandoned TG, the court found that she "has had virtually no contact with [TG]" and made "less than minimal" efforts to maintain support and communication. The court recognized that Mother sent two letters and coloring book crayons to TG, but found Mother knew visiting TG required her to contact DCS and that she made no effort to do so during the roughly one-year duration of the dependency proceeding.

¶16     In addressing the 15 months out-of-home placement ground in A.R.S. § 8-533(B)(8)(c), the court found that the barriers to reunification "from the outset were Mother's substance abuse, her lack of employment, and her lack of stable housing," and "[t]hose barriers still exist today." The court did not find Mother's testimony about her substance and alcohol usage and sobriety credible. Further, Mother had only short periods of employment including three months in one job and one month at another, and still did not have stable housing since August 2019. Thus, the court found a substantial likelihood Mother "will not be able to safely and independently care for her children in the near future," because "the barriers to Mother's reunification remain steep," "[h]er substance abuse

issues are unremediated," and her lack of stable housing and employment persist.

**¶17** The court also found DCS made reasonable efforts to provide services to preserve the family. DCS "met its obligation and appropriately referred Mother . . . to services designed to remediate the barriers to reunification." Mother was offered supervised visits at the outset of the dependency but did not engage with DCS until she was arrested in October 2021. Further, though "DCS was in the process of enlisting a case aide for virtual visits with [AM]" in March 2022, TG had "refused visits." In addition, DCS conducted "parent-locate" searches to find Mother during the dependency proceedings, referred her to Terros in September 2020 for a substance abuse evaluation and treatment, referred her for random urinalysis testing, and offered her transportation to services.

**¶18** Finally, the court determined terminating the parent-child relationship was in TG's best interests because TG has spent most of his life with paternal grandparents and they meet TG's needs and provide a home where substance abuse and abandonment are not issues, and termination will let TG achieve permanency with them. TG supported the case plan of adoption and did not want contact with Mother.

**¶19** The juvenile court permitted Mother's untimely appeal, and we have jurisdiction under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 8-235, 12-120.21(A)(1), -2101(A)(1).

## DISCUSSION

**¶20** We review the juvenile court's decision to terminate parental rights for an abuse of discretion. *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579 ¶ 10 (2021). However, we review *de novo* questions of law such as the interpretation and application of statutes and governing precedent. *Id.* at 580 ¶ 10. Because the juvenile court is in the best position to weigh evidence and judge credibility, this court will not resolve conflicting evidence or reweigh evidence. *Id.* at 579-80 ¶ 10. Rather, we accept the court's findings of fact "if reasonable evidence and inferences support them," *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151 ¶ 18 (2018) (citation omitted), and "will affirm . . . unless the juvenile court abuses its discretion or the court's findings are not supported by reasonable evidence," *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474 ¶ 14 (2022). *Accord Jessie D.*, 251 Ariz. at 579 ¶ 10.

**¶21** Mother does not challenge the statutory grounds for termination in this appeal. Terminating parental rights under A.R.S. § 8-

533(B) requires the court to find clear and convincing evidence of one statutory ground for termination of the parent-child relationship and that termination is in the child's best interests by a preponderance of the evidence. *Alma S.*, 245 Ariz. at 149 ¶ 8; *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 22 (2005) (determining that party seeking termination bears burden of proof to show termination ground by clear and convincing evidence); *see also* A.R.S. § 8-863(B) (stating clear and convincing standard). Here, Mother does not challenge the sufficiency of the evidence supporting the statutory grounds for the termination, or that termination is in the best interests of TG. *See J.W. v. Dep't of Child Safety*, 252 Ariz. 184, 188 ¶ 11 (App. 2021) (stating that a party abandons and waives arguments on appeal that are undeveloped and unsupported by legal authority and citation to the record).

**¶22** Mother instead challenges the termination order on the sole basis that DCS did not make reasonable and diligent efforts to reunify her with TG because it did not provide her services when she was in jail starting in October 2021, and specifically, failed to provide adequate visitation with TG for the first five months she was in custody. She contends DCS was required to provide visitation with TG absent extraordinary circumstances and that there was no evidence or finding that visits would physically or emotionally endanger TG.

**¶23** We affirm because reasonable evidence supports the superior court's determination that DCS made reasonable and diligent efforts to reunify the family. This satisfies the obligations DCS has in any termination under A.R.S. § 8-533(B)(8)(a) and -533(B)(8)(c). *See Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 329 ¶ 18 (App. 2007) ("[The] juvenile court must find by clear and convincing evidence that a statutory ground for termination exists and that 'the agency responsible for the care of the child has made a diligent effort to provide appropriate reunification services.'" (quoting *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004))); *see also Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23 ¶ 49 (App. 2019) (explaining that "DCS must make diligent efforts" throughout "the entire time [DCS'] case plan is [family] reunification," and the court must "consider the totality of the circumstances when determining whether DCS has made diligent efforts").

**¶24** What constitutes diligence varies, but "at the least" it requires "DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances *as they arise throughout the time-in-care period*, maintain consistent contact with the parent, and make reasonable efforts to assist the

parent in areas where compliance proves difficult." *Donald W.*, 247 Ariz. at 23 ¶ 50 (citing *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 96 ¶ 30 (App. 2009)). Here, DCS and the court identified the circumstances causing TG to be out of care as predominantly multiple substance abuse issues coupled with homelessness and unemployment. DCS offered Mother services, including substance abuse evaluation and treatment, drug testing, and transportation, but she did not participate and did not stay in contact with DCS or the court regarding her case and the proceedings.

¶25 Mother was not making efforts to participate in services for over a year before being taken into custody. By October 2021, TG already had been in out-of-home placement for about 14 months. Only after Mother was taken into custody could DCS reliably contact and communicate with her. DCS also scheduled video visitation for Mother at that time with AG, but TG did not want to participate. Thus, Mother's argument that DCS had to make additional efforts to gain her participation in reunification services, and specifically provide or ensure visitation starting in Fall 2021 when DCS did not know where she was, is unavailing.

¶26 Mother does not argue that DCS's efforts or the timing of the efforts undermined her participation, and she does not connect the lack of visitation during the five-month period starting October 2021, to any efforts to remedy her circumstances and show parental fitness. *Cf. Donald W.,* 247 Ariz. at 23 ¶ 49. Mother does contend that DCS asked her to self-refer for domestic violence counseling, thus showing DCS was nondiligent by failing to provide such service. We agree with DCS that the cumulative weight of service provision here demonstrates DCS made diligent efforts to provide her services.

¶27 Finally, Mother had been referred in September 2020 for substance abuse evaluation and treatment, and to provide random urinalysis testing, but did none of it despite being offered transportation to participate. Though Mother testified that she was sober since May or June 2021, the court did not find her testimony credible, and the other issues persisted. By the time of the termination hearing, TG had been in out-of-home placement for nearly two years, while Mother had not had stable housing for three years, lacked stable employment, and still thought she had no substance use issues to address.

¶28 Reasonable evidence and inferences support the court's findings of fact, and Mother has not shown the court abused its discretion by determining DCS made reasonable and diligent reunification efforts

under these facts and circumstances. *See Timothy B.*, 252 Ariz. at 474 ¶ 14; *Donald W.*, 247 Ariz. at 23 ¶¶ 49-50; *Jordan C.*, 223 Ariz. at 93 ¶ 17.

## CONCLUSION

¶29        For these reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA